**In re GLOSSER BROS., INC. and G.B. Holding Corporation, Debtor.**

**BIGGS, INC., Plaintiff,**

**v.**

**GLOSSER BROS., INC. and G.B. Holding Corporation, Respondents.**

**Bankruptcy No. 89–0752–BM.**
**Motion No. 90–3115M.**

United States Bankruptcy Court, W.D. Pennsylvania.

March 7, 1991.

Joseph E. Schmitt, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, Pa., for debtor.

James A. Lewis, Rothman, Gordon, Foreman & Groudine, P.C., Pittsburgh, Pa., for claimant/respondent.

James L. Weisman, Weisman & Bowen, Pittsburgh, Pa., for GB Stores and Schottenstein Stores Corp.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is an *Objection To The Claim Of Biggs, Inc.* filed by Glosser Bros., Inc. ("debtor") in the amount of $300,000.00. Debtor denies that it is indebted to Biggs in any amount and asks that the claim be disallowed in its entirety. For the reasons set forth below, debtor's objection to the Biggs' claim will be sustained.

I

### FACTS

Debtor owns several retail and discount department stores and several warehouse outlets. It maintains approximately seventy (70) departments in its stores. Most of these departments are operated by debtor itself. However, it has on occasion licensed others to operate certain departments.

On August 11, 1987, debtor and Biggs executed an agreement ("licensing agreement") whereby debtor licensed Biggs to

sell toys and sporting goods in certain of debtors stores. The licensing agreement was to expire on January 31, 1988, but was automatically renewed for an additional one-year period unless either party gave written notice to the other prior to 120 days before the expiration of the term.

On March 24, 1989, debtor filed a voluntary Chapter 11 petition and debtor served as debtor-in-possession during the case. Biggs was operating as licensee under the licensing agreement, which still was in effect at the time debtor filed its petition.

On September 7, 1989, approximately five (5) months after the filing of its bankruptcy petition, the parties, at the instigation of Biggs, executed another agreement ("subsequent agreement"). It provided that Biggs would continue to operate in eighteen (18) of debtor's stores until January 27, 1990, when debtor would take over operation of the departments. The relationship between debtor and Biggs was to terminate as of that date, and Biggs was to remove all of its merchandise from the departments by no later than February 10, 1990. All other terms and conditions of the licensing agreement were to remain in effect.

Debtor neither sought nor obtained court approval of the subsequent agreement.

On January 9, 1990, debtor filed a Joint Plan of Reorganization, which contained the following provision:

> [E]ach executory contract ... of the Debtors will be deemed rejected as of the Plan Consummation Date unless a motion for assumption is filed prior to the Confirmation Date.

The Joint Plan of Reorganization was confirmed by the court shortly thereafter. Debtor did not file a motion to assume the licensing agreement prior to the date of confirmation.

On March 16, 1990, Biggs filed a proof of claim in the amount of $300,000.00 for damages allegedly resulting from debtor's alleged rejection of the licensing agreement in accordance with the above provision in debtor's Plan. Debtor objected to Biggs' proof of claim and denied that it was indebted to Biggs in any amount.

A hearing was conducted on the matter on February 27, 1991.

## II

### THE POSITIONS OF THE PARTIES

Biggs' position may be summarized as follows. The licensing agreement was an executory contract. The subsequent agreement was executed postpetition and attempted to *reject* the licensing agreement. Since 11 U.S.C. § 365(a) is the *exclusive* means whereby a debtor-in-possession may reject an executory contract, the licensing agreement could be rejected only if court approval was obtained. Debtor did not obtain court approval of the subsequent agreement. As a consequence, the subsequent agreement was a nullity and had no legal effect. The licensing agreement was still in effect when debtor's Plan was confirmed and was only rejected under said Plan.

Debtor's position may be summarized as follows. 11 U.S.C. § 365(a) is not dispositive of this case. By its terms, § 365(a) applies to "rejection" of an executory contract. The subsequent agreement did not "reject" the licensing agreement, for purposes of § 365(a); rather, it merely "terminated" the licensing agreement. 11 U.S.C. § 365(a) is *not* the *exclusive* means whereby a debtor-in-possession may terminate an executory contract. A debtor-in-possession may, pursuant to 11 U.S.C. § 363(c)(1), enter into transactions in the ordinary course of business. Court approval of such transactions is not required. The subsequent agreement was entered into in the ordinary course of business and therefore effectively terminated Biggs' license prior to the date of Plan confirmation, even in the absence of court approval. Consequently, the licensing agreement was not rejected under said Plan.

## III

### ANALYSIS

A. *The Applicability of 11 U.S.C. § 365(a).*

■ The first issue presented in this case is whether 11 U.S.C. § 365(a) controls.

If it does, then debtor's admitted failure to obtain court approval of the subsequent agreement entails that it had no legal effect and did not constitute rejection of the licensing agreement.

11 U.S.C. § 365(a) provides as follows:

Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

By its terms, § 365(a) requires court approval anytime a debtor-in-possession seeks to "reject" an executory contract. If court approval is not obtained, the rejection is a legal nullity. *In re Marple Publishing Co., Inc.,* 20 B.R. 933, 934–35 (Bankr.E.D. Pa.1982).

The Bankruptcy Code does not define "rejection". Moreover, there appears to be no bright-line test for determining whether the subsequent agreement constitutes a "rejection" of the licensing agreement. Those cases which have dealt with rejection under § 365(a) offer little or no guidance in this case.

The totality of the circumstances in this case compels the conclusion that the subsequent agreement did *not* purport to "reject" the licensing agreement. To the contrary, it appears to the court that at the urging of Biggs the parties amicably agreed to modify the terms of their relationship so as to further their individual needs.

According to the terms of the licensing agreement, which still was in effect on September 7, 1989, said agreement would be automatically renewed for another year unless debtor or Biggs gave written notice of termination at least 120 days prior to January 31, 1990. If debtor intended to terminate the licensing agreement, all it had to do was give written notice to Biggs by that time. Such notice would *not* have constituted a *rejection* of the licensing agreement but, rather, a declaration of intention *not to renew* the licensing agreement for another term of one year. Court approval would not have been required pursuant to 11 U.S.C. § 365(a) under such circumstances. Debtor did not, however, give such written notice but instead executed the subsequent agreement.

The reason for the subsequent agreement sheds light on whether it constituted a "rejection" of the licensing agreement. Biggs was aware that debtor was experiencing severe financial problems and was fearful that debtor would file for bankruptcy and close its doors prior to the end of the Christmas shopping season, which traditionally is the most profitable time of year for toy vendors. Debtor executed the subsequent agreement to give "comfort" to Biggs by assuring it that debtor would remain open and Biggs would be able to sell its goods in debtor's stores until after the Christmas season had passed.

Careful comparison of the two agreements shows that the subsequent agreement added little or nothing to the licensing agreement and only terminated Biggs' license four (4) days sooner than under the licensing agreement—i.e., on January 27, 1990 instead of on January 31, 1990. The net effect of the subsequent agreement was little different than would have resulted had debtor elected to give Biggs timely notification of debtor's intention to terminate Biggs' license under the licensing agreement.

It makes little sense to describe the subsequent agreement as a "rejection" of the licensing agreement considering that it was executed in order to assure Biggs that the licensing agreement would not be terminated prematurely and considering that it effected little or no material change in the terms of the licensing agreement.

There is an additional reason why the subsequent agreement cannot be regarded as a rejection of the licensing agreement. The subsequent agreement was not unilateral action taken by debtor and imposed upon claimant. Rather, it was mutually agreed to by debtor and Biggs. The term "rejection", in common parlance, seems to involve a unilateral decision by one party which is not mutually acceptable to another party. There is nothing to indicate that the concept of rejection, as it applies to 11

U.S.C. § 365(a), is different in this regard or that the subsequent agreement was unacceptable to Biggs. Clearly it was not imposed upon Biggs as it was put to paper at their instigation and served as a comfort to them.

The most reasonable conclusion in light of the foregoing is that the subsequent agreement was not contemplated as a "rejection" of the licensing agreement and that 11 U.S.C. § 365(a) does not control. Failure on the part of debtor to obtain court approval of the termination agreement under these facts and circumstances does not entail that said agreement had no legal effect.

B. *The Applicability of 11 U.S.C. § 363(c)(1).*

Debtor argues that the subsequent agreement was effective, in spite of its admitted failure to obtain court approval, because said agreement was a transaction occurring "in the ordinary court of business".

11 U.S.C. § 363(c)(1) provides in relevant part as follows:

> If the business of the debtor is authorized to be operated under section ... 1108 ... of this title and unless the court orders otherwise, the trustee may enter into transactions ... ***in the ordinary course of business, without notice or hearing*** ... (emphasis added).

It is undisputed that debtor, as debtor-in-possession, "stood in the shoes" of a trustee pursuant to 11 U.S.C. § 1107(a), and that this debtor was authorized to operate its own business pursuant to 11 U.S.C. § 1108. It is also undisputed that there were no court-imposed restrictions on debtor's authority to operate its business.

The issue presented here is whether the subsequent agreement entered into by and between debtor and Biggs was a transaction "occurring in the ordinary course of debtor's business", for purposes of 11 U.S.C. § 363(c)(1). If it was, court approval was not required to make said agreement effective.

The Bankruptcy Code offers no definition of the expression "ordinary course of business". The expression has been given content by means of two tests: the "vertical" test and the "horizontal" test. *In re Hanson Industries, Inc.,* 90 B.R. 405 (Bankr.D.Minn.1988); *In re Waterfront Companies, Inc.,* 56 B.R. 31 (Bankr.D. Minn.1985).

The so-called "vertical test" considers the debtor's activities from the perspective of a creditor. The pivotal question becomes: "Did I expect and accept the economic risks inherent in this transaction when I decided to become a creditor?" This test focuses on a comparison of debtor's prepetition and postpetition activities in order to ascertain whether any significant change has occurred. *In re Glosser Brothers, Inc.,* 100 B.R. 268, 270 (Bankr.W. D.Pa.1989).

The so-called "horizontal test", also sometimes referred to as the "industry-wide test", compares debtor's transactions to those of similar businesses in order to determine whether the transaction or activity at issue is commonplace in the operation of a particular type of business. *Id.*

Regardless of which of the above tests is to be utilized, the evidence presented in this case overwhelmingly establishes that the subsequent agreement was entered into in the ordinary course of debtor's business.

Debtor had over the years licensed others to operate three (3) of the seventy (70) departments it maintained in its stores. Specifically, debtor had licensed others to operate its records and tapes department, its health and beauty aids department, and its toys and sporting goods department. Three (3) different licensees had operated debtor's records and tapes department over the past ten (10) to twelve (12) years. Two (2) different licensees had operated its health and beauty aids department in the past until debtor decided in 1983–84 to operate the department itself.

Similarly, debtor had had an agreement with a different licensee to operate its toys and sporting goods department before debtor licensed Biggs in 1987 to operate that department.

It had been debtor's practice to conduct periodic reviews of the sales, income, and customer image of departments headed by licensees. If debtor was dissatisfied with a licensee's performance, debtor would terminate its relationship with that licensee. It was on this basis that debtor made the above changes in its licensees.

Moreover, it was on this basis that debtor executed the subsequent agreement with Biggs on September 7, 1989. As has been indicated, debtor executed this agreement in part to give assurance to Biggs that Biggs would be able to sell its merchandise through the 1989 Christmas season. Debtor also executed this agreement because it was seriously dissatisfied with Biggs' performance and it already had decided not to renew Biggs' license. Specifically, debtor was dissatisfied because sales in the toys and sporting goods department had declined dramatically, prices were not competitive, and inventory was inadequate and outmoded.

Debtor's practices, as outlined above, conformed to standard practices in the department store industry as a whole. It is common industry practice for a department store to license others to operate certain departments and for the department store to terminate the license when it is dissatisfied with the performance of the licensee.

In light of the foregoing, it must be concluded that the subsequent agreement executed on September 7, 1989 occurred in the ordinary course of debtor's business. It therefore follows, pursuant to 11 U.S.C. § 363(c)(1), that court approval was *not* required in order for the agreement to have legal effect. Consequently, debtor's objection to Biggs' claim will be sustained. Biggs' claim will be disallowed in its entirety.

An appropriate Order will be issued.