**In re NORTH AMERICAN ROYALTIES, INC., Wheland Holding Company, Inc., Wheland Manufacturing Company, Inc., and Wheland Foundry, LLC, Debtor.**

No. 01–17271.

United States Bankruptcy Court,
E.D. Tennessee,
Southern Division.

April 29, 2002.

Neal Batson, Matthew W. Levin, Jason H. Watson, Alston & Bird LLP, Atlanta, GA, Richard C. Kennedy, Kennedy, Koontz & Farinash, Chattanooga, TN, for debtor.

## MEMORANDUM

R. THOMAS STINNETT, Bankruptcy Judge.

The court must decide whether to grant or deny a motion by the chapter 11 debtor, North American Royalties (NAR), to terminate medical and life insurance benefits for retirees. The beneficiaries include retired hourly employees and retired salaried employees. The court will refer to them as the hourly beneficiaries and the salaried beneficiaries.

Section 1114 of the bankruptcy code allows a chapter 11 debtor or trustee to modify retiree benefits by negotiating with the retirees' representative and reaching an agreement. 11 U.S.C. § 1114. NAR contends that it can terminate the retiree benefits for both the hourly and the salaried beneficiaries without meeting the requirements of § 1114.

As to the hourly beneficiaries, NAR contends that it has complied with § 1114 nevertheless; it has negotiated with the United Steel Workers (the union), and they have reached an agreement to terminate the retiree benefits in question. The court has already approved the agreement between NAR and the union to the extent it terminates the collective bargaining agreement. The court approved the agreement as being in accordance with § 363 and § 1113 of the bankruptcy code. 11 U.S.C. §§ 363(b) & 1113. Being abundantly cautious, NAR wants to make sure that *if* § 1114 requires separate approval for termination of the retiree benefits, then it has the court's approval.

The court begins with the question of whether to approve the agreement with the hourly beneficiaries. NAR's motion asserts that, for the purposes of § 1114, the union is the authorized representative of the hourly beneficiaries because their benefit plan is required by the collective bargaining agreement with the union. 11 U.S.C. § 1114(b)(1), (c). The court agrees. As to the hourly beneficiaries, NAR and their authorized representative have negotiated in good faith and have reached an agreement in accordance with § 1114. The union does not have a conflict of interest between the retired hourly beneficiaries and current employees because NAR is in the process of liquidating, has laid off almost all its employees, and will eventually have no employees. *Century Brass Products, Inc. v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (In re Century Brass Products, Inc.)*, 795 F.2d 265 (2d Cir.1986).

To approve the agreement, the court need not make the findings required by § 1114(g). 11 U.S.C. § 1114(e), (g). This leaves two questions. Is the court required to approve the agreement? If so, what standard should the court apply?

The court has dealt with these questions under § 1113 of the bankruptcy code. Section 1113 imposes essentially the same process as to collective bargaining agreements that § 1114 imposes as to retiree benefits. 11 U.S.C. §§ 1113 & 1114. The court was asked to approve an agreement between NAR and the union to terminate their collective bargaining agreement. The court treated the termination agreement as a transaction outside the ordinary course of business that required approval under § 363 of the bankruptcy code. 11 U.S.C. § 363(b). The court also held that § 363 required a sound business

purpose to justify approval of the agreement. *Stephens Industries, Inc. v. McClung,* 789 F.2d 386 (6th Cir.1986); *In re New Era Resorts, LLC,* 238 B.R. 381 (Bankr.E.D.Tenn.1999); Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection",* 59 U.Colo. L.Rev. 845, § III.D. at 895–900 (1988).

The same reasoning applies to this agreement to terminate the retiree benefits of the hourly beneficiaries. Section 1114 does not require approval, but § 363 of the bankruptcy code does. The question, then, is whether NAR has shown a sound business purpose for terminating the retiree benefits of the hourly beneficiaries.

The court will deal with that question later in this opinion. The court must first deal with whether NAR can terminate the benefits for the salaried beneficiaries.

NAR has not bargained with an authorized representative for the salaried beneficiaries. Section 1114 does not identify an authorized representative for the salaried beneficiaries. The statute provides that the court may appoint a committee to represent them, but the court has not appointed a committee. 11 U.S.C. § 1114(b)(1), (d). NAR argues that the union adequately represented the salaried beneficiaries, and the agreement with the union should be binding on them also. But this is not NAR's main argument for termination of the benefits to the salaried beneficiaries. NAR contends it need not comply with § 1114 because it can terminate the benefits contract in accordance with the contract's terms and § 1114 does not prohibit such termination.

A number of the salaried beneficiaries filed a motion to continue the hearing on NAR's motion to terminate. The motion for a continuance requests additional time to discover whether each version of the benefit plan reserved to NAR the power to terminate the benefit contract at any time. The motion also asks for appointment of a committee of salaried retirees to represent their interests.

The court heard the salaried beneficiaries' motion at the same time as NAR's motion to terminate. Mr. Wayne Tamme testified for NAR. He is the vice president for human resources. He is in charge of the benefit plans in question. He identified three summary plan descriptions—the SPD's. Mr. Tamme testified that the three SPD's cover the entire period of the benefit plans, from 1981 through the present. Mr. Tamme did not find any SPD dated later than the 1995 SPD. Mr. Tamme testified that he also did not find any separate plans or other SPD's. At 55 pages long, the 1981 SPD is the shortest of the three.

The 1981 SPD reserves the right to terminate, suspend, withdraw, amend or modify the Plan at any time "subject to the applicable provisions of the Group Policy." Exh. A, p. 53. Mr. Tamme did not find any separate group policy. Mr. Tamme testified that the coverage for every retiree is determined by the current plan—not an earlier plan that was in effect at the time of the beneficiary's retirement.

The 1990 SPD and the 1995 SPD appear to agree with Mr. Tamme. They define eligible employees to include those who retired after March 1, 1982. This allows an argument that the 1981 SPD is irrelevant because that benefit contract was superseded by the later contracts. The salaried beneficiaries have two opposing arguments. First, the later SPD's do not cover all employees who were covered by the 1981 SPD since it took effect on March 1, 1981—not March 1, 1982—and it applied to some earlier retirees. Exhibit A, page 11. Second, if the 1981 group policy prevented NAR from terminating the benefit contract, then the beneficiaries

of the 1981 plan became vested with its benefits; they are entitled to those benefits without regard to later benefit contracts.

These arguments make no difference, however, if no group policy existed. After a diligent search, NAR has not been able to find any group policy that covered the same period as the 1981 SPD. Neither party has attempted to prove any terms of a group policy that are different from those stated in the 1981 SPD. In this situation, the court will treat the SPD as the entire benefit contract without any group policy to vary its terms. *Anderson v. Alpha Portland Industries, Inc.,* 836 F.2d 1512 (8th Cir.1988); *Alday v. Container Corp.,* 906 F.2d 660 (11th Cir.1990), *cert. den.,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); *see also Golden v. Kelsey–Hayes Co.,* 73 F.3d 648 (6th Cir. 1996) (burden of proof as to terminability of retiree benefits under a collective bargaining agreement); *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. BVR Liquidating, Inc.,* 190 F.3d 768 (6th Cir.1999) (distinguishing between retiree benefits under a collective bargaining agreement and others). It follows that the right to terminate reserved in the 1981 SPD is not limited by the provisions of a group policy that may or may not have existed.

NAR's lawyer represented that NAR's officers or employees who were present would state that they did not remember a group policy and believed NAR was always self-insured. The 1990 SPD and the 1995 SPD reveal that NAR self-insured the medical benefits under those plans. In each of these SPD's, the explanation is found under the heading, "How The Benefits Are Provided". The 1990 SPD states that benefits other than life insurance and special accident coverage are provided directly by NAR. The 1995 SPD refers to medical and dental benefits as provided directly by NAR. Thus, the 1990 and 1995 SPD leave no doubt that NAR was self-insured as to the medical benefits from 1990 until the present. The term "self-insured" means the plan sponsor, NAR in this case, does not have insurance; it pays the expenses from its income.

Mr. Tamme testified that NAR pays an insurance company to administer the medical benefits—to handle the claims and let NAR know how much money to deposit in the account to pay the claims. NAR does have a stop loss insurance policy. It provides coverage for claims by one beneficiary to the extent they exceed $125,000 in one year. The plans in question cover 194 beneficiaries, 97 hourly beneficiaries and the 97 salaried beneficiaries. Mr. Tamme testified that medical coverage for the salaried and the hourly beneficiaries will cost about $100,000 per month, about $50,000 for each group.

Mr. Tamme testified that the group life insurance for the salaried beneficiaries costs about $2,100 per month. He also testified that the coverage is portable, meaning that a beneficiary can continue it at his or her own expense.

There is no dispute regarding NAR's status as an ongoing business. It is not. As stated in the motion to terminate, NAR has ceased operations, laid off almost all its employees, and is in the process of liquidating all its assets. It does not have and will not have income to continue paying benefits. In other words, benefits can be paid only from money that might otherwise be retained to pay creditors' claims in the bankruptcy cases.

For this reason, the attorney for the unsecured creditors' committee appeared and voiced the committee's support for NAR's motion to terminate the benefits. The attorney for the lenders' group also voiced their support for NAR's motion to

terminate. This lenders' group is not represented on the unsecured creditors' committee, and according to their attorney, the group is likely to have very large unsecured claims. Their attorney also stated that if these retiree benefits must be continued, his clients will move to convert the case to a liquidation under chapter 7 of the bankruptcy code so that § 1114 will not apply. 11 U.S.C. §§ 103 & 1112(b).

The 1990 SPD stated that NAR reserved the right to terminate, suspend, withdraw, amend or modify the plan at any time based solely on NAR's decision. The 1995 SPD contained the same reservation of rights. Neither of these made an exception for terms of any group policy.

At the continued hearing, the attorneys agreed that NAR had conducted a diligent search, and that it was unable to find any additional relevant documents. The attorney for the objecting salaried retirees conceded that the SPD's, except for the 1981 SPD, allow NAR to terminate the plans at any time. He did not state how the first SPD was different, but he had brought out at the earlier hearing its reference to the group policy as a possible limit on NAR's right to terminate. The court has already decided that since no group policy has been found, it should treat the SPD as controlling, and therefore, NAR's power to terminate is not restricted by the provisions of a group policy.

The primary legal question is whether the right to terminate the plans at any time for any reason relieves NAR from the duty to follow the procedures required by § 1114. If so, then NAR was not required to negotiate with an authorized representative of the salaried employees before terminating the benefit plan.

The bankruptcy code allows a chapter 11 debtor to reject an executory contract. 11 U.S.C. § 365. Rejection is independent of the contract terms. The decision to reject or assume should be based on the economic benefit to the debtor and its creditors— the economic benefit to the bankruptcy estate. The chapter 11 debtor or trustee may assume the contract, perform it, and receive the profit for the bankruptcy estate, if the debtor has the resources to perform the contract. The chapter 11 debtor or trustee may accomplish almost the same result by assuming the contract and selling it (assigning it) to someone else. 11 U.S.C. § 365(f). If the chapter 11 debtor rejects, the debtor will not have the burden of performing the contract, and the other party to the contract will have a claim in the bankruptcy case for damages. The debtor should reject an executory contract when rejection produces a greater economic benefit for the bankruptcy estate than assuming the contract and performing or assigning it. Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845, § III.D. at 895–900 (1988).

The right in bankruptcy to reject or assume an executory contract does not render the contract ineffective during the time allowed for the debtor to decide whether to assume or reject. The debtor can terminate according to the contract terms without rejecting the contract. In other words, the debtor need not reject the contract in order to terminate it as allowed by the contract terms. Likewise, the court has not found any decision saying the debtor must assume the contract in order to terminate it according to its terms. Termination as allowed by the contract is separate from rejection or assumption. *NBD Park Ridge Bank v. SRJ Enterprises, Inc. (In re SRJ Enterprises, Inc.)*, 150 B.R. 933 (Bankr.N.D.Ill.1993); *Biggs, Inc. v. Glosser Bros., Inc. (In re Glosser Bros., Inc.)*, 124 B.R. 664 (Bankr. W.D.Pa.1994).

■ The debtor may choose termination because it produces a greater economic benefit for the bankruptcy estate than either rejection or assumption. When the debtor terminates a contract as allowed by the contract's terms, the debtor disposes of property of the bankruptcy estate. This suggests the court should allow or disallow termination under § 554, which allows the trustee or debtor in possession to abandon property of the bankruptcy estate. 11 U.S.C. § 554; Fed.R.Bankr.P. 6007. But § 363 may be more appropriate to the situation. It allows the chapter 11 debtor or trustee to use property of the bankruptcy estate out of the ordinary course of business only if the court approves after notice and a hearing. 11 U.S.C. § 363(b) & § 102(1); Fed.R.Bankr.P. 6004. The court will approve if the debtor has a sound business purpose for the proposed use of the property. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re New Era Resorts, LLC*, 238 B.R. 381 (Bankr.E.D.Tenn.1999). Whether § 554 or § 363 applies, requiring a sound business purpose appears to be the better standard for this situation, and the court will apply it. Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845, § III.D. at 895–900 (1988).

■ Thus, a chapter 11–debtor generally can terminate an executory contract, as allowed by the contract's terms, without assuming or rejecting it. An argument can be made that a retiree benefits contract does not come within the traditional definition of an executory contract, but they have generally been treated as executory contracts, and § 1114 is based on the assumption that they are. Leslie T. Gladstone, *Retiree Benefits Bankruptcy Protection Act of 1988: Welfare Benefits in Need of Reform*, 65 Am.Bankr.L.J. 427, 438 (1991).

■ Does § 1114 of the bankruptcy code prohibit termination of retiree benefits contracts? Section 1114 defines retiree benefits as benefits called for by the pre-chapter 11 contract and requires the debtor to continue paying them until they are modified as allowed by § 1114. 11 U.S.C. § 1114(a), (e). These rules give rise to the argument that the debtor cannot terminate a retiree benefits contract: the debtor can escape the duty to pay only by obtaining modifications under § 1114— not by any other means such as termination.

Section 1114 could define retiree benefits only by referring to the debtor's obligations under a pre-chapter 11 contract, fund or plan. Section 1114 limits the debtor's contractual right, if any, to modify retiree benefits without consulting the retirees. It says nothing about whether the debtor can exercise a power reserved in the contract to terminate it and thereby end any obligation for retiree benefits as defined in § 1114(a). Despite § 1114, the debtor can terminate the contract as allowed by its terms. *In re Doskocil Cos.*, 130 B.R. 870 (Bankr.D.Kan.1991); Daniel Keating, *Bankruptcy Code § 1114: Congress' Empty Response to the Retiree Plight*, 67 Am.Bankr.L.J. 17, 41–42 (1993).

In this regard, involuntary termination of the contract by the debtor, as allowed by the terms of the contract, should not be treated as a modification that can be accomplished only by following the procedures of § 1114. If the debtor can prove the contractual right to terminate and that the termination should be approved under § 554 or § 363, then it can terminate despite the limits of § 1114. The law should not require the debtor to comply with the negotiation procedures of § 1114 before attempting to terminate the contract, as allowed by its terms, because § 1114 does not limit the debtor's right under the con-

tract to terminate it. Compliance with § 1114 is irrelevant to the issue of termination in accordance with the contract's terms.

If § 1114 prevents termination as allowed by the contract, then it creates for chapter 11 debtors a system that Congress did not impose on employers outside of chapter 11. The relevant non-bankruptcy law is primarily the Employee Retirement Income Security Act, commonly known as ERISA. 29 U.S.C. §§ 1001 *et seq.* ERISA imposes vesting as to pension benefits but not retiree welfare benefits such as these. A right to terminate a welfare benefit plan prevents vesting. *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir.1998). If § 1114 takes away the contractual right to terminate, then the filing of a chapter 11 case causes the vesting of retiree welfare benefits that were not previously vested.

Furthermore, § 1129(a)(13) would vest the benefits after reorganization. Section 1129(a)(13) requires the plan to provide for continued payment of retiree benefits according to the pre-chapter 11 contract or the modifications made under § 1114. 11 U.S.C. § 1129(a)(13). Of course, the benefits may be modified in accordance with § 1114, but then the modified benefits would be vested. Thus, a debtor could successfully reorganize under chapter 11 only by vesting retiree welfare benefits even though the benefits were not vested when the debtor filed the chapter 11 case, and ERISA does not require vesting of retiree welfare benefits.

Likewise, if §§ 1114 and 1129(a)(13) nullify a debtor's right to terminate a retiree benefits contract, they may provide better protection in chapter 11 cases for retiree welfare benefits than § 1113 provides for pension benefits created under a collective bargaining agreement. Section 1113 allows a chapter 11 debtor or trustee to reject a collective bargaining agreement.

11 U.S.C. § 1113. Indeed, § 1114 and § 1129(a)(13) could work against pension recipients.

Congress could have intended these unusual results, but the court will not attribute that intent to Congress without convincing evidence, which does not exist. Instead, the court understands that § 1114 and § 1129(a)(13) were enacted against the background of ERISA, which allows a contract for retiree welfare benefits to provide the employer the right to terminate. *See In re Doskocil Cos.*, 130 B.R. 870 (Bankr.D.Kan.1991).

Barring termination as allowed by the contract also does not make sense for bankruptcy purposes. It would lead to widely disparate treatment of debtors, their other creditors, and retirees according to whether the debtor terminated the benefits contract before filing chapter 11. Daniel Keating, *Bankruptcy Code § 1114: Congress' Empty Response to the Retiree Plight*, 67 Am.Bankr.L.J. 17, 42–43 (1993).

It could also influence the filing of involuntary bankruptcy petitions by creditors, including retirees who have not been paid their benefits. 11 U.S.C. § 303. The retirees could gain a great advantage over other creditors by filing an involuntary petition under chapter 11 if it prevents debtor from terminating their benefits in accordance with the contract.

Other courts have pointed out that § 1114 does not make sense in liquidating chapter 11 cases, such as this one, where the debtor will not produce income to continue payment of retiree benefits. *In re GF Corp.*, 120 B.R. 421 (Bankr.N.D.Ohio 1990), *appeal dismissed sub nom. Argeras v. GF Corp.*, 140 B.R. 884 (N.D.Ohio 1992); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515 (Bankr.S.D.N.Y.1991); *In re Garfinckels, Inc.*, 124 B.R. 3 (Bankr.D.D.C.1991).

In summary, § 1114 and § 1129(a)(13) do not prevent NAR from exercising its contractual right to termi-

nate the retiree benefits plan. Furthermore, NAR has proved a sound business reason for terminating the plan. In this regard, the sound business reason must be determined in light of NAR's liquidation of its assets. NAR is ceasing business. It will not have income to pay continuing business expenses. There will be a fixed pool of money for payment of unsecured claims. If NAR does not terminate the retiree benefits, payment of those benefits will reduce the pool of money available to pay all other unsecured claimants. The hourly beneficiaries recognized this and agreed to termination of their retiree benefits. The attorney for the objecting salaried beneficiaries admitted that they can probably do nothing more than delay termination of the retiree benefits. The court finds that NAR has a sound business reason for terminating the retiree benefits contract.

The court's finding that NAR has a sound business reason for terminating the retiree benefits contract applies also to NAR's agreement with the hourly beneficiaries to terminate their retiree benefits. The court has already pointed out that approval of an agreement only requires the court to find a sound business reason.

The final question is whether to appoint a committee of salaried beneficiaries. The objecting salaried beneficiaries complained that notice of NAR's motion did not go to all the salaried beneficiaries so that they would be warned of the termination of their retirement benefits, and appointment of a committee would create a delay during which they could be warned. Notice is required so that interested parties can appear and object. The objecting salaried beneficiaries received sufficient notice to file a motion that raised the possible objections to NAR's motion. The court granted a continuance to give them the opportunity for more discovery and to assure a correct view of the facts. The

objecting salaried beneficiaries have ably represented the interests of the group. Delaying the termination would impose on NAR the typical cost of continuing the benefits, but it would also impose the risk of additional large claims during the delay. The major unsecured creditors who would bear the cost and the risk are not willing to bear them. A delay could be very costly to NAR and would not lead to a different final result; the benefits would still be terminated by motion or conversion to chapter 7. Furthermore, the course of events in this chapter 11 case has made it obvious for some time that employee and retiree benefits would come to an end rather soon. There is no need to appoint a committee of salaried beneficiaries to negotiate, and there are no other reasons that make it appropriate to appoint a committee. 11 U.S.C. § 1114(d); *In re Doskocil Cos.*, 130 B.R. 870 (Bankr.D.Kan.1991).

The court will enter an order approving the agreement with the hourly beneficiaries and the termination of the contract as to the salaried beneficiaries, and denying the motion to continue and for appointment of a committee. The agreement with the union provides for termination of benefits as of April 30, 2002, and NAR needs to avoid the cost of continuing the benefits and the threat of large new claims during any continuation. Therefore, the court will make the order immediately effective under Fed.R.Bankr.P. 6004(g).

This Memorandum constitutes findings of fact and conclusions of law as required by *Fed.R.Bankr.P.* 7052.

## ORDER APPROVING AGREEMENT TO TERMINATE CERTAIN NON–PENSION RETIREE BENEFITS AND TERMINATING CERTAIN NON–PENSION RETIREE BENEFITS

The debtor, North American Royalties, Inc. (NAR) for itself and the other above-

captioned debtors filed a motion under 11 U.S.C. §§ 363 & 1114 to authorize termination of certain non-pension retiree benefits (the motion to terminate). The motion to terminate deals with benefits for retired union or hourly employees and retired salaried employees. A number of retired salaried employees (the objectors) filed a motion to continue the hearing on NAR's motion to terminate and to appoint a committee of retired salaried employees under 11 U.S.C. § 1114(d).

In accordance with the court's memorandum opinion entered this date—

It is ORDERED that the agreement between NAR and the United Steel Workers of America to terminate, effective April 30, 2002, the non-pension retiree benefits of the retired union or hourly employees is approved;

It is FURTHER ORDERED that NAR's contracts or plans to provide non-pension retiree benefits to the retired union or hourly employees *and* to the retired salaried employees are terminated, effective April 30, 2002, as allowed by the terms of the contracts or plans.

It is FURTHER ORDERED that the objectors' motion for continuance of the hearing on NAR's motion to terminate is denied to the extent it seeks any continuance in addition to the one already granted;

It is FURTHER ORDERED that the objectors' motion for appointment of a committee under 11 U.S.C. § 1114(d) is denied; and

It is FURTHER ORDERED that this order is effective immediately and is not stayed under Rule 6004(g) of the Federal Rules of Bankruptcy Procedure.