PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT
_____

No. 10-1944
_____

IN RE VISTEON CORPORATION, ET AL.


IUE-CWA, THE INDUSTRIAL DIVISION OF THE
COMMUNICATIONS WORKERS OF AMERICA, AFL-
CIO, CLC,

Appellant,

v.

VISTEON CORPORATION, DEBTORS AND DEBTORS
IN POSSESSION; and THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF VISTEON
CORPORATION,

Appellees.

On Appeal from the United States District Court
for the District of Delaware
No. 10-cv-00091
District Judge: Judge Michael M. Baylson (Specially

1

Presiding)

Argued May 28, 2010

Before: McKEE, *Chief Judge,* and RENDELL and
STAPLETON, *Circuit Judges.*

(Opinion filed July 13, 2010)

Thomas M. Kennedy, Esq. (**Argued**)
Susan M. Jennick, Esq.
Kennedy, Jennik & Murray
113 University Place
7th Floor
New York, NY 10003
*Attorney for Plaintiff -Appellant*

Susan E.Kaufman, Esq.
Heiman, Gouge & Kaufman
800 King Street, Suite 303
Wilmington, DE 19801
*Attorney for Plaintiff-Appellant*

Steven D. McCormick, Esq. (**Argued**)
Andrew B. Bloomer, Esq.
Patrick M. Bryan, Esq.
Kirkland & Ellis
300 North LaSalle Street
Suite 2400
Chicago, IL 60654

Laura D. Jones. Esq.
James E. O'Neill, III, Esq.
Pachulski Stank Ziehl & Jones
919 North Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE 19801
*Attorneys for Appellee Visteon Corporation*

Robert J. Stark, Esq. (**Argued**)
Howard L. Siegel, Esq.
Brown Rudnick
7 Times Square
47th Floor
New York, NY 10036

William P. Bowden, Esq.
Gregory A. Taylor, Esq.
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150, 8th Floor
Wilmington, DE 19899
*Attorneys Appellee Official Committee of Unsecured Creditors*

## OPINION

McKEE, *Chief Judge*.

The Industrial Division of the Communications Workers of America ("IUE-CWA" or "the union"), as the representative

3

of approximately 2,100 retirees from Visteon Corporation's manufacturing plants in Connersville and Bedford, Indiana, appeals the district court's order, affirming the bankruptcy court's order permitting Visteon to terminate retiree health and life insurance benefits without complying with the procedures set forth in 11 U.S.C. § 1114. Both courts reasoned that, notwithstanding the language of that statute, it would be unreasonable to interpret § 1114 as limiting an employer's right to modify or terminate benefits during the pendency of a Chapter 11 bankruptcy proceeding, if the employer could unilaterally terminate those benefits outside of bankruptcy pursuant to a reservation of rights clause in the benefit plan. Since Visteon reserved the right to unilaterally terminate the retiree benefits at issue here, the courts concluded that Congress did not intend § 1114 to limit that right.

On appeal, the union argues that the plain language and

legislative history of § 1114 compel exactly the result the district and bankruptcy courts avoided. The union claims that Congress intended to restrict a debtor's ability to modify or terminate, except through the § 1114 process, *any* retiree benefits during a Chapter 11 bankruptcy proceeding, regardless of whether the debtor could terminate those benefits outside of bankruptcy. Based on the plain language of § 1114 (as well as its legislative history), we agree. Accordingly, as explained more fully below, we will reverse the order of the district court and remand for further proceedings.[1]

## I. Factual and Procedural History

---

[1] The union also argues that the bankruptcy court erred in finding that Visteon has the right to unilaterally terminate these benefits under the relevant plan documents and collective bargaining agreements. Because we conclude that § 1114 applies regardless of whether Visteon has such a right outside of bankruptcy, we need not reach this question. For the purposes of our opinion, we assume, *arguendo*, that Visteon could unilaterally terminate these benefits if it were not in a Chapter 11 bankruptcy proceeding.

Visteon Corporation is one of the world's largest suppliers of automotive parts. Originally formed as a division of Ford Motor Corporation, it spun off in 2000 to become its own corporate entity. In doing so, it took over operation of plants in Connersville and Bedford, Indiana previously run by Ford or its wholly-owned subsidiaries. *See* J.A. 3848. Hourly workers at both plants were represented by the IUE-CWA. *See* J.A. 2218-326, 3242-392.

For decades, Visteon, or its predecessors-in-interest, have provided certain health and life insurance benefits to retirees from these plants. *See, e.g*, J.A. 504, 1163. Visteon's agreement to provide such benefits has been memorialized in successive collective bargaining agreements ("CBAs"), as well as in summary plan descriptions ("SPDs").

The most recent SPDs at both plants state that retiree medical coverage will "continue during retirement" or

6

"continue[] during retirement until . . . death." J.A. 434, 1076. However, both SPDs have language wherein Visteon retains its right to modify or terminate coverage. The second page of each SPD provides in part as follows:

> Visteon Systems, LLC intends to continue the Plan as described in this handbook. However, the Company reserves the right to suspend, amend or terminate the Plan – or any of the coverages or features provided under the Plan – at any time and in any ma[nn]er to the extent permitted by law (subject to the collective bargaining requirements). As a result, this handbook is not a contract, nor is it a guarantee of your coverages.

J.A. 417, 1060 (with slight variations). Each SPD reiterates:

> Visteon Systems, LLC intends to continue the Plan indefinitely. However, the Company reserves the right to suspend, modify or amend the benefits provided under the Plan, or even terminate the Plan or any of the benefits provided under the Plan.
>
> However, the Plan is subject to the provisions of

7

the current Collective Bargaining Agreements[2] between the Plan Sponsor and [the unions]. As a result, this handbook is not a guarantee of your coverage.

J.A. 489, 1145 (with slight variations).

Visteon closed its Connersville plant in 2007 and its Bedford plant in 2008. Prior to each plant closing, the union and Visteon negotiated Closing Agreements that set forth the terms under which the plants would close. *See* J.A. 571-77, 1325-30. For the most part, these agreements do not refer to retiree benefits. However, the agreements do include a Waiver and Release, which provides in relevant part: "Visteon may in the future amend its benefit plans and make available different retirement, placement or separation benefits for which I may not be eligible. The Plant Closure Agreement does not limit or in any way

_____

[2] The last CBAs at each plant included commitments by Visteon to provide retiree benefits. *See* J.A. 691, 1355. These express written commitments were not continued after the plants were closed.

modify the provisions of any benefit plan." J.A. 575, 1328.

On May 28, 2009, Visteon filed a petition for Chapter 11 bankruptcy in the District of Delaware. *See* J.A. 12. Since filing the petition, Visteon has continued to operate its business as a debtor in possession, and is in the process of restructuring so that it can successfully emerge from bankruptcy. *See* J.A. 133.

On June 26, 2009, Visteon moved the bankruptcy court for permission to terminate all United States retiree benefit plans pursuant to 11 U.S.C. § 363(b)(1).[3] *See* J.A. 50. Visteon's request affected approximately 8,000 of Visteon's present and former employees, their spouses, and their dependants. *See* J.A.

---

[3] Section 363(b)(1) provides that the bankruptcy trustee "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). This provision is in contrast to transactions that *are* in the ordinary course of business under subsection (c)(1) of § 363, which do not require notice and a hearing. *See* 11 U.S.C. § 363(c)(1).

106. Several groups of retirees, including the 1,700 Connersville retirees and 400 Bedford retirees represented by the IUE-CWA, objected. *See* J.A. 111-14, 3572. They argued that Visteon could not terminate any retiree benefits during a Chapter 11 proceeding without first complying with the requirements of § 1114. *See* J.A. 350.

On December 10, 2009, the bankruptcy court granted Visteon's motion as to the vast majority of the retiree benefits, including those at issue in this appeal.[4] *See* J.A. 3571. The court concluded that since Visteon has the right under non-bankruptcy law to terminate benefits unilaterally, § 1114 did not apply. *See id.* The court explained:

---

[4] The bankruptcy court granted Visteon's motion to terminate all retiree benefits, except for those promised or provided to present and former employees at Visteon's North Penn plant, pursuant to a CBA that had not yet expired. *See* J.A. 3581-82. The court made clear, however, that once the CBA did expire, Visteon could terminate those benefits as well. *See* J.A. 3582.

[The] Court finds that as a matter of applicable non-bankruptcy law, as well as the plain meaning of the controlling documents, the Debtors would have outside of bankruptcy the right to terminate these plans at will . . . .

. . . The reason that the benefits can be terminable . . . is that they are not vested. In making my ruling, I incorporate *in toto* Judge Drain's analysis in [*In re Delphi Corp.*, No. 05-44481, 2009 WL 637315 (Bankr. S.D.N.Y. Mar. 10, 2009)], and I rely on that analysis as a support for my ruling. . . . I hold that the plain meaning [analysis] as applied by Judge Venter[] in [*In re Farmland Indus., Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003),] . . . is not persuasive . . . [because it] would lead to an absurd result in that it would expand retiree rights beyond the scope of state law for no legitimate bankruptcy purpose. Under [*Butner v. United States*, 440 U.S. 48, 54 (1979)], which is based on constitutional principles, the statute cannot modify existing state law [absent] some specific bankruptcy reason and there is none here in connection with the issue of non-vested retiree benefits.

J.A. 3573-74. The bankruptcy court therefore evaluated Visteon's motion to terminate retiree benefits under § 363, and authorized the termination based on the court's conclusion that

11

it was a reasonable exercise of business judgment. *See* J.A. 3571, 3581.

Even though Visteon could terminate its benefit payments immediately pursuant to the bankruptcy court's order, it remained obligated under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. §§ 1161-68, to provide lifetime COBRA coverage to retirees whose benefits it discontinued during a Chapter 11 proceeding. Visteon consulted with its benefit administrators and determined that it would take several months to terminate the old plans and set up new COBRA plans. *See* J.A. 3688-92, 3844-45. Visteon therefore planned to delay termination of payments for retiree benefits until April 1, 2010. *See* J.A. 3844-45. After that date, retirees could continue their Visteon health coverage only by electing COBRA coverage, and paying the full cost of that coverage plus a two percent administrative fee. *See, e.g.*, J.A.

12

3593.

On February 26, 2010, the union moved the bankruptcy court for a stay pending appeal of its order permitting the termination of benefits. *See* J.A. 3790-802. The bankruptcy court denied the motion. *See* J.A. 3829-34. Despite finding that some Medicare-ineligible retirees faced irreparable harm,[5] it concluded that the union was unlikely to succeed on the merits on appeal, and therefore it could not meet the burden for obtaining preliminary injunctive relief. *See id.*

Visteon appealed the bankruptcy court's decision to the district court, and also moved that court for a stay of the bankruptcy court's order. The district court denied the appeal, and refused to issue a stay pending appeal. *See* J.A. 3.1. The district court concluded that the bankruptcy court's finding that

---

[5] As of August 2009, approximately forty percent of the Connersville and Bedford retirees were not yet eligible for Medicare. *See* J.A. 3690.

the benefits were not vested was not clearly erroneous.  *See* J.A. 3.3.  It also agreed with the bankruptcy court's conclusion that the protections afforded by § 1114 did not apply to retiree benefits that could be unilaterally terminated outside of bankruptcy.  Although the court acknowledged that the union's argument to the contrary might "seem legitimate based on a plain reading of the statute," it nonetheless reasoned that such an interpretation would result in retirees receiving "more protection from a company under bankruptcy than they would receive from a company outside of bankruptcy . . . a unique if not revolutionary interpretation of the Bankruptcy Code by improving on the pre-petition, contractual rights of a third party constituent as a result of the filing of a bankruptcy case."  J.A. 3.6.

The district court did, however, grant a limited one-month stay so that the union could seek expedited appeal.  The

14

court acknowledged that the union's legal argument had some merit, as "neither the Supreme Court nor any circuit court has ruled on this issue," and its contrary reading of § 1114 was supported only by "the interpretation of § 1114 by several respected Bankruptcy Judges." J.A. 3.6-3.7. It also noted that "a strict application of the 'plain meaning' doctrine may warrant a fresh reading of this statute," but that "such an interpretation would still have to get over the hurdle that interpreting the statute [in that manner] results in the retirees getting more protection through a bankruptcy proceeding than they would absent bankruptcy." J.A. 3.7; *see also* J.A. 3932-34.

During the one-month stay granted by the district court, Visteon was permitted to provide insurance solely through COBRA plans.[6] However, it was required to pay the April 2010

---

[6] A Visteon benefits administrator submitted a declaration to the bankruptcy court explaining that a stay which required Visteon to provide insurance through its original benefit plans,

15

premiums of any Medicare-ineligible retirees who purchased insurance.  *See* J.A. 1-3.  This expedited appeal followed.[7]

Effective May 1, 2010, Visteon stopped all payments for the retiree benefits at issue in this case, and the retirees were able to continue Visteon health insurance only through paying for COBRA coverage.  The union represented at oral argument that the majority of the approximately 840 Medicare-ineligible retirees are now without health insurance, as the cost of purchasing coverage through COBRA or other private insurance providers is prohibitive.[8]

---

rather than through the COBRA plans it was poised to put into effect, could not be effectuated by the health insurance companies for approximately three months, and during that time, no one, including those retirees who had elected COBRA coverage, would be covered.  *See* J.A. 3688-95.

[7] On April 13, 2010, we granted the union's motion to expedite the appeal, but denied the motion to continue the stay. The stay granted by the district court expired April 30, 2010.

[8] The cost of COBRA coverage for those retirees who submitted declarations to the bankruptcy court ranges from

## II. Jurisdiction and Standard of Review

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  The district court had jurisdiction pursuant to 28 U.S.C. §§ 158(a) and 1334.  We have jurisdiction pursuant to 28 U.S.C. § 158(d).

Our review of the district court's decision "effectively amounts to review of the bankruptcy court's opinion in the first instance."  *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989).  We review the bankruptcy court's legal conclusions de novo.  *See Ferrara & Hantman v. Alvarez* (*In re Engel*), 124 F.3d 567, 571 (3d Cir. 1997).

## III. Chapter 11 Bankruptcy and the Protections of § 1114

---

$670.85 to $2,012.54 a month, constituting twenty-three to eighty-six percent of the retirees' monthly incomes.  *See* J.A. 3656-87.  Many of these retirees and their family members suffer from extremely serious medical conditions, including cancer, diabetes, heart disease, muscular dystrophy, fibromyalgia, chronic obstructive pulmonary disease, and schizophrenia.  *See id.*

As a general rule, "Chapter 11 of the Bankruptcy Code strikes a balance between two principal interests: facilitating the reorganization and rehabilitation of the debtor as an economically viable entity, and protecting creditors' interests by maximizing the value of the bankruptcy estate." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 303 (3d Cir. 2010). Section 1114, however, factors another interest into the balancing equation. As we have explained, § 1114 "was enacted to protect the interests of retirees of chapter 11 debtors." *Gen. DataComm Indus., Inc. v. Arcara* (*In re Gen. DataComm Indus., Inc.*), 407 F.3d 616, 620 (3d Cir. 2005) (quoting 7 *Collier on Bankruptcy*, ¶ 1114.02[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2002)).

Section 1114 was enacted, along with its counterpart § 1129(a)(13), as the primary substantive components of the Retiree Benefits Bankruptcy Protection Act of 1988

18

("RBBPA"), Pub. L. No. 100-334, 102 Stat. 610 (1988) (codified as amended at 11 U.S.C. §§ 1114, 1129(a)(13)). Congress enacted the RBBPA in response to LTV Corporation's termination of the health and life insurance benefits of 78,000 retirees during its 1986 Chapter 11 bankruptcy, with no advance notice to the affected retirees.[9] *See* S. Rep. No. 100-119 (1987), reprinted in 1988 U.S.C.C.A.N. 683, 683 ("The bill . . .

---

[9] Congress enacted and twice renewed stop-gap legislation to ensure that LTV continued to pay its retiree benefits while Congress debated the problem. *See* Pub. L. No. 99-591 tit. VI § 608(a) ("Notwithstanding any provision of chapter 11 of title 11, United States Code, the trustee shall pay benefits until May 15, 1987 to retired former employees under a plan, fund, or program maintained or established by the debtor prior to filing a petition (through the purchase of insurance or otherwise) for the purpose of providing medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death."); Pub. L. No. 100-41 (extending requirement to pay benefits to September 15, 1987); Pub. L. No. 100-99 (extending requirement to pay benefits to October 15, 1987). Finally, in 1988, it enacted the RBBPA, which itself contained an interim measure extending the stop-gap protections to certain cases already proceeding in bankruptcy. The rest of the RBBPA, codified at 11 U.S.C. § 1114 and 11 U.S.C. § 1129(a)(13), applies to bankruptcy proceedings commenced after its enactment.

addresses situations with respect to retiree insurance benefits, such as occurred last year when LTV Corporation, after filing a Chapter 11 Bankruptcy petition, immediately terminated the health and life insurance benefits of approximately 78,000 retirees.").

In crafting § 1114, Congress provided certain procedural and substantive protections for retiree benefits during a Chapter 11 proceeding. Section 1129(a)(13) ensures that some measure of those protections extends beyond the proceeding. For the purposes of both sections, "retiree benefits" are defined as:

> payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependants, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

11 U.S.C. § 1114(a).

Section 1114(e) provides in relevant part that: "[n]otwithstanding any other provision of this title, the [trustee[10]] shall timely pay and shall not modify any retiree benefits" unless the court, on the motion of the trustee or authorized representative of the retirees,[11] orders, or the trustee and the authorized representative agree to, the modification of such benefits.  11 U.S.C. § 1114(e).

---

[10] A trustee is defined for the purposes of § 1114 to include a debtor in possession, and therefore includes Visteon here.  *See* 11 U.S.C. § 1114(e)(1).

[11] "A labor organization shall be . . . the authorized representative of those persons receiving any retiree benefits covered by any collective bargaining agreement to which that labor organization is a signatory," unless the labor organization declines to serve that role, or the court "determines that different representation of such persons is appropriate."  11 U.S.C. § 1114(c)(1).  "[A] committee of retired employees . . . [shall] serve as the authorized representative . . . of those persons receiving any retiree benefits not covered by a collective bargaining agreement" if the debtor seeks "to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate."  11 U.S.C. § 1114(d).

21

The trustee must attempt to reach an agreement with the retirees regarding modification of retiree benefits before it can ask the bankruptcy court to modify or terminate them.[12] Section 1114(f) requires that the trustee "make a proposal to the authorized representative of the retirees . . . which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1114(f)(1)(A). The trustee must also provide the authorized representative with information about the company's financial situation to allow for informed evaluation of the proposal. *See* 11 U.S.C. § 1114(f)(1)(B). After making this proposal, the trustee must

---

[12] During these negotiations, however, the court may grant interim modifications in retiree benefits "if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate." 11 U.S.C. § 1114(h)(1).

22

meet with the authorized representative to "confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits." 11 U.S.C. § 1114(f)(2).

The court will grant a motion to modify retiree benefits only if it finds that the trustee has made a proposal satisfying these requirements, the authorized representative has refused to accept it without "good cause," and the "modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities."[13] 11 U.S.C. § 1114(g). Even after the court

---

[13] Upon the filing of a motion for the modification of benefits, the court must, with certain limited exceptions, hold a hearing within fourteen days. 11 U.S.C. § 1114(k)(1). The court must rule on the motion, again with certain exceptions, within ninety days of the commencement of the hearing. 11 U.S.C. § 1114(k)(2). "If the court does not rule on such application within ninety days after the date of the commencement of the hearing, or within such additional time as the trustee and the authorized representative may agree to, the trustee may implement the

23

permits a modification, however, the authorized representative may still move for an increase in benefits, which the court should grant if consistent with the § 1114(g) standard. *See id.*

Section 1114(e) provides additional protection for retiree benefits by giving them priority they would not otherwise have. That provision states: "[a]ny payment for retiree benefits required to be made" during a Chapter 11 proceeding "has the status of an allowed administrative expense" under 11 U.S.C. § 503, rather than the general unsecured status that would otherwise apply. 11 U.S.C. § 1114(e)(2). Benefits paid during the proceeding do not reduce the retirees' general unsecured claim "for any benefits which remain unpaid . . . [whether] based upon . . . a right to future unpaid benefits or from any benefits not paid as a result of modifications allowed pursuant

_____

proposed modifications pending the ruling of the court on such application." *Id.*

to this section." 11 U.S.C. § 1114(i).

Congress focused the protections of § 1114 on retirees who would otherwise be without needed benefits. Thus, Congress specified that § 1114 does not apply to "any retiree, or the spouse or dependents of such retiree, if such retiree's gross income for the twelve months preceding the filing of the bankruptcy petition equals or exceeds $250,000," unless that retiree is able to show that s/he cannot otherwise obtain comparable coverage. 11 U.S.C. § 1114(m).

As already noted, the RBBPA also amended § 1129(a), the section of Chapter 11 which sets forth the requirements a reorganization plan must satisfy in order for the bankruptcy court to approve the reorganization and allow the debtor to emerge from bankruptcy. The RBBPA added the requirement that:

The plan provides for the continuation after its

effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).

## IV. Discussion

As explained at the outset, this appeal requires that we decide whether § 1114 limits a debtor's ability to terminate *during* bankruptcy those retiree benefits that it could, consistent with plan documents, collective bargaining obligations, and the prescriptions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-461, terminate unilaterally *outside* of bankruptcy.[14] The union argues that the

---

[14] As we will discuss in further detail below, ERISA does not require vesting of welfare benefits, such as retiree health and life insurance, and an employer is generally free to unilaterally terminate them at any time and for any (or no) reason, unless it contracts away that right. *See, e.g.*, *In re Lucent Death Benefits ERISA Litig.*, 541 F.3d 250, 256 (3d Cir. 2008). Accordingly,

plain language of § 1114 applies to all retiree benefits, whether or not the debtor could terminate those benefits outside of bankruptcy pursuant to language in the applicable plan documents reserving that right. Appellees Visteon and the Official Committee of Unsecured Creditors ("Unsecured Creditors") counter by relying primarily on the majority view of courts that have addressed this issue. Like the courts in those cases, Appellees contend that restricting a debtor from terminating during bankruptcy those retiree benefits that it could otherwise terminate at will is absurd, and courts must conclude that the plain language of a statute does not reflect congressional

outside of the bankruptcy context, there are only two circumstances in which an employer cannot unilaterally terminate benefits: first, if the employer has promised to continue providing the benefits for life, i.e., if the employer has agreed that the benefits will vest; or, second, even if the benefits are not vested, if there is a current CBA or other employment agreement in place, requiring payment of those benefits during the life of that agreement.

27

intent if it produces an absurd result.

We hold that § 1114 is unambiguous and clearly applies to any and all retiree benefits, including the ones at issue here. Moreover, despite arguments to the contrary, the plain language of § 1114 produces a result which is neither at odds with legislative intent, nor absurd. Accordingly, disregarding the text of that statute is tantamount to a judicial repeal of the very protections Congress intended to afford in these circumstances. We must, therefore, give effect to the statute as written. *See Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts – at least where the disposition required by the test is not absurd – is to enforce it according to its terms.") (internal quotation marks omitted).

We recognize that the majority of bankruptcy and district courts that have addressed this issue have concluded that § 1114

28

does not limit a debtor's ability to terminate benefits during bankruptcy when it has reserved the right to do so in the applicable plan documents. *See, e.g.*, *Retired W. Union Employees Ass'n v. New Valley Corp.* (*In re New Valley Corp.*), No. 92-4884, 1993 WL 818245 (D. N.J. Jan. 28, 1993); *In re Delphi Corp.*, No. 05-44481, 2009 WL 637315 (Bankr. S.D.N.Y. Mar. 10, 2009); *In re N. Am. Royalties, Inc.*, 276 B.R. 860 (Bankr. E.D. Tenn. 2002); *In re Doskocil Cos.*, 130 B.R. 870 (Bankr. D. Kan. 1991). *But see Retailers Serv. Corp. v. Employees' Comm. of Ames Dep't Store, Inc.* (*In re Ames Dep't Stores, Inc.*), Nos. 92 Civ. 6145-46, 1992 WL 373492 (S.D.N.Y. Nov. 30, 1992); *In re Farmland Indus., Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003).

We also realize that our conclusion appears to be in tension with the decision of the Court of Appeals for the Second Circuit in *LTV Steel Co. v. United Mine Workers* (*In re*

29

*Chateaugay Corp.*), 945 F.2d 1205 (2d Cir. 1991).  There, the court was confronted with the related, but different, issue of § 1114's applicability to benefits provided pursuant to a CBA that expires while the debtor is in Chapter 11 proceedings.

We are convinced that in reaching these contrary conclusions as to the scope of § 1114, these courts mistakenly relied on their own views about sensible policy, rather than on the congressional policy choice reflected in the unambiguous language of the statute.

## A.  Plain Language

As in all cases of statutory construction, our analysis of § 1114 begins with the statute's plain language.  *See, e.g.*, *Hourly Employees/Retirees of Debtor v. Erie Forge & Steel, Inc.* (*In re Erie Forge & Steel*), 418 F.3d 270, 276 (3d Cir. 2005) (construing "authorized representative" provision of § 1114 in accordance with its plain language).  The words of a statute are

30

not to be lightly jettisoned by courts looking to impose their own logic on a statutory scheme. *See United States v. Terlingo*, 327 F.3d 216, 221 (3d Cir. 2003) (Courts may look behind a statute only when the plain meaning produces "a result that is not just unwise but is clearly absurd.") (internal quotation marks omitted). When statutory language is plain and unambiguous, "the sole function of the courts . . . is to enforce it according to its terms." *Lamie*, 540 U.S. at 534 (internal quotation marks omitted). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). It is for Congress, not the courts, to enact legislation. When courts disregard the language Congress has used in an unambiguous statute, they amend or repeal that which Congress enacted into law. Such a failure to defer to the clearly expressed statutory language of Congress runs contrary to the bedrock principles of

31

our democratic society. *See Lamie*, 540 U.S. at 538 ("Our unwillingness to soften the import of Congress' chosen words . . . results from 'deference to the supremacy of the Legislature.'") (quoting *United States v. Locke*, 471 U.S. 84, 95 (1985)).

As discussed above, § 1114(e)(1) plainly states: "[n]otwithstanding any other provision of this title, the [trustee] shall timely pay and shall not modify *any retiree benefits*," except through compliance with the procedures set forth therein. 11 U.S.C. § 1114(e)(1) (emphasis added). "Retiree benefits" are defined, in turn, as "*payments to any entity or person* for [certain select purposes] *under any plan, fund, or program* . . . maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(a) (emphasis added). With the exception of subsection (m), which specifies that § 1114 does not apply to

32

high-income retirees able to obtain comparable benefits, § 1114 contains no limitation or restriction.

Section 1114 could hardly be clearer. It restricts a debtor's ability to modify *any* payments to *any* entity or person under *any* plan, fund, or program in existence when the debtor files for Chapter 11 bankruptcy, and it does so notwithstanding any other provision of the bankruptcy code. There is therefore no ambiguity as to whether § 1114 applies here. Congress did not restrict the application of § 1114 to those benefits that the debtor was otherwise compelled to provide. Benefits that the debtor *could* have terminated outside of bankruptcy, but which it was nonetheless providing at the time of its Chapter 11 filing, are plainly included in the phrase, "payments to any entity or person . . . under any plan, fund, or program."

Congress took care to specifically exclude some benefits from the protective umbrella of § 1114. The protections

established therein do not extend to benefits provided for purposes other than health, accident, disability, or death; or to benefits provided to high-income retirees able to obtain comparable coverage; or to benefits contemplated, but not maintained or established, prior to the debtor's filing for bankruptcy. However, Congress did not limit § 1114's otherwise broad scope based on whether or not the debtor reserved a right to terminate in its plan. *See In re Farmland Indus., Inc.*, 294 B.R. at 916-17 ("On its face, the language of the statute is clear. . . . There is nothing in the language of the statute to suggest that Congress intended to allow the termination of retiree benefits in those instances where the debtor has the right to unilaterally terminate those benefits under the language of the plan or program at issue.").

Nevertheless, the Unsecured Creditors argue that § 1114 is ambiguous because it does not specifically address whether

34

benefits which could be unilaterally terminated outside of bankruptcy are "retiree benefits." However, that is not an ambiguity. Language is ambiguous only if it is "reasonably susceptible of different interpretations." *Dobrek v. Phelan*, 419 F.3d 259, 264 (3d Cir. 2005) (internal quotation marks omitted). It is impossible to read the plain language of § 1114 as excluding benefits which are terminable outside of bankruptcy because, as we have explained, they are plainly "payments to any entity or person . . . under any plan, fund, or program."

Furthermore, a statute is not ambiguous simply because it is broad. "In employing intentionally broad language, Congress avoids the necessity of spelling out in advance every contingency to which a statute could apply." *In re Philadelphia Newspapers*, 599 F.3d at 310. By using the word "any" three separate times, Congress ensured that the statute would apply to all benefits, absent the few exceptions directly addressed,

35

without its having to itemize that entire universe of benefits. We are, therefore, unpersuaded by the suggestion that failure to specifically address benefits that could be unilaterally terminated outside of bankruptcy somehow breathes ambiguity into the word "any." The breadth of the statute's language requires that it be universally applied absent the few exceptions included in the text; it does not create a license to disregard the statute's plain language.

Visteon relies upon *In re Chateaugay Corp.* in arguing that the phrase "under any plan, fund, or program" makes § 1114 ambiguous in these circumstances, because it compels judicial consideration of the plan under which benefits are provided. Otherwise, according to Visteon, it would be impossible to determine which benefits, if any, are due. The court in *Chateaugay* addressed the distinct but related issue of

36

whether the RBBPA's interim measure[15] required a debtor to continue paying retiree benefits during bankruptcy even after expiration of the applicable CBA. The court concluded that the debtor was free to terminate benefits without complying with § 1114. It reasoned:

> The Act expressly states that the trustee in bankruptcy . . . must continue to "pay benefits to retired former employees under a plan, fund, or program maintained or established by the debtor prior to filing a petition [for bankruptcy]." Thus, we must analyze the "plan, fund, or program maintained or established" by LTV before it filed

---

[15] As discussed above, *supra* note 9, because those portions of the RBBPA codified at § 1114 and § 1129(a)(13) were applicable only to bankruptcy proceedings initiated after the statute's enactment, the RBBPA also included an interim measure extending previously enacted stop-gap protections to ongoing bankruptcy proceedings. We note that although the protections provided by the interim measure were similar to those now provided by § 1114, its plain language was less adamant. The interim measure provided: "the trustee shall pay benefits to retired former employees under a plan, fund, or program maintained or established by the debtor prior to filing a petition" during the bankruptcy proceeding and until a plan is confirmed, unless modification is agreed to by the parties or ordered by the court. Pub. L. No. 100-334, § 3 (amending Pub. L. No. 99-591).

37

> for bankruptcy in order to determine the trustee's obligation to LTV's retired former employees.

945 F.2d at 1207. Since the debtor there was not obligated to continue paying benefits upon expiration of the CBA, the court reasoned that no further payments were necessary.

However, as the dissent in *Chateaugay* pointed out, the Second Circuit majority's analysis failed to remain faithful to the plain language of the provision the court was interpreting. The majority concluded that the statute only mandated continuation of payments the debtor was *required to make under a plan*, as opposed to simply payments being made *under a plan*. This is not what the statute said. Congress did not use the word "required," nor did it use the word "obligations." Rather, as we have explained, Congress mandated that the debtor continue to pay benefits "under a plan, fund, or program maintained or established by the debtor prior to filing a

38

petition." The expiration of the agreement to provide benefits did not alter the fact that those benefits were provided "under" a plan that was in effect when the petition was filed. Interpreting this language in light of the legislative history, the *Chateaugay* dissent concluded that the measure required continuation of "*all* retiree health benefits . . . in effect immediately prior to bankruptcy," including those retiree benefits provided pursuant to a CBA that expires during the course of the bankruptcy proceeding. 945 F.2d at 1213.

To the extent that *Chateaugay* is relevant to our analysis, we find Judge Restani's cogent and well-reasoned dissent more persuasive, and far more faithful to the statutory text than the analysis of that court's majority. However, the issue before the court in *Chateaugay* differed from the one before us, and whatever the merits of Visteon's argument in that context, it

39

plainly fails here.[16]

Given the importance of the text, it is worth reiterating that § 1114(e)(1) requires that a trustee "shall timely pay and shall not modify any retiree benefits."  11 U.S.C. § 1114(e)(1). "Retiree benefits" are defined as "payments to any entity or person . . . under any plan, fund, or program . . . maintained or established in whole or in part by the debtor prior to filing a petition."   11 U.S.C. § 1114(a).   Payments made during bankruptcy under a plan that is terminable at will are unambiguously "retiree benefits" under this definition.  The fact that the debtor could have unilaterally stopped the payments had

---

[16] Notably, the dissent in *Chateaugay* interpreted the district court as having agreed that the RBBPA's interim measure would apply to benefits terminable at will, even though it would not apply to benefits under an expired CBA.  *See* 945 F.2d at 1211 ("The district court decided, in essence, that although the Act applies to health benefits that are terminable at will, it does not apply to health benefits that are provided pursuant to a contract obligation which is interpreted to have expired.").

40

it not been in Chapter 11 is therefore irrelevant. Once a bankruptcy petition is filed, § 1114(e) takes effect, and the trustee must "timely pay and . . . not modify any retiree benefits" except through the § 1114 procedure.[17]   Benefit payments pursuant to a terminable at will plan in effect when the petition is filed thus continue to be for the pendency of the proceeding "under any plan, fund, or program."

It is also argued that § 1114 becomes ambiguous when read in conjunction with its counterpart § 1129(a)(13). As we have noted, the latter provision was also enacted as part of the RBBPA. It is a "cardinal rule" of statutory interpretation that "a

---

[17] Visteon argues that the statute as construed this way is nonsensical because it would prompt any rational soon-to-be debtor to terminate retiree benefits on the eve of bankruptcy. However, as we will explain, Congress anticipated that "escape hatch" and closed it with its 2005 addition to § 1114 of subsection (*l*). That subsection prohibits an insolvent debtor from terminating retiree benefits in the six months prior to filing for bankruptcy. *See* 11 U.S.C. § 1114(*l*).

statute is to be read as a whole." *Leckey v. Stefano*, 501 F.3d 212, 220 (3d Cir. 2007) (internal quotation marks omitted). Reading § 1114 in conjunction with § 1129(a)(13), however, merely reinforces our conclusion that § 1114 limits Visteon's ability to modify or terminate *any* retiree benefits.

Section 1129(a)(13) specifies that in order to emerge from bankruptcy, the debtor's reorganization plan must provide for:

> the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits**.**

11 U.S.C. § 1129(a)(13). Ambiguity is purportedly ushered in through the phrase, "for the duration of the period the debtor has obligated itself to provide such benefits." As we have

42

explained, § 1114 contains no limitation based on the debtor's obligation to provide benefits, yet § 1129(a)(13) clearly does. Courts, assuming that Congress intended the two provisions to be identical in scope, have accordingly found ambiguity when considering them together. In *In re New Valley Corp.*, for example, the court acknowledged that "the language of section 1114, particularly the phrase 'any retiree benefits' appears to embrace all retiree benefit plans in its modification procedures." 1993 WL 818245, at *4. However, because it read § 1129(a)(13) as "appear[ing] to limit the application of section 1114 to retiree benefits which the debtor has 'obligated itself' to pay, presumably pursuant to prior contractual agreement," *id.*, the court concluded that the "statutory scheme [was] not clear," *id.*, at *3. It looked beyond the plain language of the statute to ascertain the meaning of § 1114.

The union advocates a quite different interpretation of §

43

1129(a)(13), which it contends avoids creating ambiguity in §

1114. It posits that the clause, "for the duration of the period the

debtor has obligated itself to provide such benefits," refers

solely to those obligations that a debtor takes on during the §

1114 process, and not to any extra-bankruptcy obligations.

According to the union, § 1129(a)(13):

> does not come into play until the § 1114 process
> has been completed and a Chapter 11 debtor has
> obligated itself to continue retiree benefits for
> some period of time in the course of a § 1114
> process. Section 1129[(a)](13) merely ensures
> that retirees who exit the § 1114 process having
> secured a promise from the debtor that their
> retiree benefits will continue for a period of time
> do in fact receive the benefit of their bargain in
> the Chapter 11 Plan upon its confirmation.

Appellant's Br. 31-32.

Although we agree that § 1129(a)(13) does not create

ambiguity in the statutory scheme, we are not persuaded by the

union's interpretation of the provision for two reasons. First, the

syntax of the section is inconsistent with the union's argument that § 1129(a)(13) obligations arise solely from § 1114. Section 1129(a)(13) requires the continuation of the payment of retiree benefits, "at the level established [through the § 1114 process], for the duration of the period the debtor has obligated itself to provide such benefits." 11 U.S.C. § 1129(a)(13). The continuation of payments is accordingly to be in accordance with two separate clauses. The first, "at the level established [through the § 1114 process]" clearly states that the level of benefits is the level agreed upon, or ordered by the court, pursuant to § 1114. The second, "for the duration of the period the debtor has obligated itself to provide such benefits," contains no such reference to § 1114. Had Congress intended to refer to a "duration" or "obligation" arising from the § 1114 process, it would have said so. It would have required the continuation of retiree benefits "at the level, and for the duration, established"

45

pursuant to § 1114.

Secondly, the union's reading is incompatible with how § 1114 operates in practice. Section 1114 permits modification of retiree benefits either by agreement between the debtor and the authorized representative, or, if agreement cannot be reached, through court order. In those instances in which agreement is reached, any duration agreed upon could be described as "the duration of the period the debtor has obligated itself to provide such benefits." However, where the court has *ordered* modification, it makes no sense to refer to the court-ordered duration as something to which the debtor has "obligated itself."

We think "the duration of the period the debtor has obligated itself to provide such benefits" plainly encompasses *any* durational obligations, including those arising outside of the bankruptcy context. Of course, such obligations could be

46

modified by agreement during the § 1114 process. *Cf. In re N. Am. Royalties, Inc.*, 276 B.R. at 867 ("Section 1129(a)(13) requires the plan to provide for continued payment of retiree benefits according to the pre-chapter 11 contract or the modifications made under § 1114."). However, the § 1114 process may not yield agreement on durational obligations, either because no agreement is reached at all and modification is court-ordered, or because the agreement reached addresses only level of benefits and not duration. In such cases, the sole source of durational obligations is the underlying contractual agreements, and if the debtor has no obligations under those agreements, as is the case here, § 1129(a)(13) does not require continuation of benefit payments upon the debtor's emergence from bankruptcy.

Contrary to the court's reasoning in *In re New Valley Corp.*, however, we do not believe that Congress intended the

plain language of § 1129(a)(13) to limit the reach or operation of § 1114. Rather, the difference in the plain language of these two provisions compels the opposite conclusion.

A "fundamental canon of statutory construction" is that where a section of a statute does not include a specific term or phrase used elsewhere in the statute, "the drafters did not wish such a requirement to apply." *United States v. Mobley*, 956 F.2d 450, 452-53 (3d Cir. 1992); *see also BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another.") (alteration in original) (internal quotation marks omitted). By including "for the duration of the period the debtor has obligated itself to provide such benefits" in § 1129(a)(13), Congress requires debtors emerging from bankruptcy to continue to provide benefits only if they are otherwise obligated

48

to. So long as they do not take on new durational obligations during the § 1114 process, debtors emerge from Chapter 11 as free to terminate benefits as they would have been had they never entered Chapter 11.

In sharp contrast, § 1114 requires the continuation of all retiree benefits without limitation to "the period the debtor has obligated itself to provide such benefits." We must assume that this omission was purposeful. As Professor Susan Stabile explains in her thorough discussion of § 1114, "when Congress wanted to limit a company's responsibility for retiree benefits, it explicitly did so. . . . The omission of [§ 1129(a)(13)'s] explicit language in section 1114's provisions . . . indicates that Congress did not implicitly intend to adopt the same contractual, durational limit in that context.'" Susan Stabile, *Protecting Retiree Medical Benefits in Bankruptcy: The Scope of Section 1114 of the Bankruptcy Code*, 14 Cardozo L. Rev. 1911, 1932

(1993) [hereinafter "*The Scope of Section 1114*"]. Therefore, during the limited period of the bankruptcy proceeding, we conclude that Congress intended to do exactly what it said, require the debtor to continue and not modify any retiree benefits, even if it would not otherwise be obligated to continue them.[18]

In interpreting this scheme, we also cannot ignore the substantial change in debtors' rights enacted in 2005 through the amendment of § 1114 to include subsection (*l*). *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) (codified at 11 U.S.C. § 1114(*l*)). Subsection (*l*) provides:

---

[18] Moreover, as we explain below, this result is consistent with the economic realities of bankruptcy, as well as the circumstances and discussions that lead to enactment of the RBBPA. Together, § 1114 and § 1129(a)(13) ensure that retiree benefits are protected when they are most vulnerable, during the bankruptcy proceeding itself.

> [i]f the debtor, during the 180-day period ending on the date of the filing of the petition – (1) modified retiree benefits; and (2) was insolvent on the date such benefits were modified; the court . . . shall issue an order reinstating as of the date the modification was made, such benefits as in effect immediately before such date unless the court finds that the balance of the equities clearly favors such modification.

11 U.S.C. § 1114(*l*).

Subsection (*l*) prevents an insolvent debtor from terminating retiree benefits in the six-month period *before* filing for bankruptcy. Like the rest of § 1114, this subsection contains no limitation based on whether the debtor has obligated itself to continue providing these benefits. Additionally, though, § 1114(*l*) would be virtually meaningless if it did not apply to those benefits the debtor could unilaterally terminate or modify. Outside of the bankruptcy context, an employer is already prohibited by various laws, including ERISA, the Labor-Management Relations Act of 1947, codified in various sections

of 29 U.S.C., and basic principles of contract law, from modifying those benefits it is obligated to provide. Subsection (*l*) therefore has meaning only if it adds something new, namely, the protection of benefits a would-be debtor could otherwise terminate at will.

Subsection (*l*) therefore provides additional evidence of the coherence of the statutory scheme Congress has created here. Many of the cases relied on by Appellees to support their contention that § 1114 cannot apply to terminable at will benefits were decided before this 2005 amendment, and therefore the courts issuing them did not have the benefit of this added evidence of congressional intent. Although we think that the language of § 1114 was always unambiguous, this subsection certainly reinforces our view of the text. *See* 7 *Collier on Bankruptcy* ¶ 1114.03[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) ("[L]ending some support to [the

52

minority] view [that § 1114 applies to benefits which are terminable at will], is the 2005 addition of new subsection (*l*) to section 1114 limiting a company's ability to 'modify' retiree benefits during the 180-day period prior to the filing of the bankruptcy petition.").

We realize, as Visteon correctly argues, that the bankruptcy court for the Southern District of New York in *In re Delphi Corp.* recently considered and rejected the argument that the 2005 amendment of § 1114 undermines the majority view that the provision does not apply if benefits are terminable at will. However, the reasoning in *In re Delphi Corp.* is unpersuasive because the court's analysis is not faithful to the plain language rule that it purports to, and must, apply.

Although the *Delphi* court stated that "[t]he starting point for [this] analysis is the language of the statute," the court did not actually begin its analysis with the statutory text. *In re*

53

*Delphi Corp.*, 2009 WL 637315, at \*2. Instead, it immediately turned to case law and to a consideration of "fundamental principles underlying the Bankruptcy Code." *Id.* Based on those principles, it concluded that "the provision's language does not compel the interpretation" that § 1114 applies to those benefits which could be terminated unilaterally outside of the bankruptcy context. *Id.* Later, the court addressed subsection (*l*). It stated:

> Section 1114(*l*) . . . does not specifically deal with the issue of plans modifiable as of right and could conceivably apply to pre-bankruptcy breaches by debtors in financial distress of vested rights. More importantly, even if it does also apply to modifiable plans, I do not view Section 1114(*l*), which applies to a specific type of prepetition action, as overruling *Doskocil* and the line of cases that follow it, which apply to postpetition actions, nor does there appear to me to be any legislative history or other policy statement . . . that would clearly set forth Congress' intention generally in Section 1114(*l*) to override, beyond its specific terms, the fundamental principle that bankruptcy does not give new rights to individual

54

parties in interest . . . .

*Id.*, at * 6.

This analysis exemplifies a fundamental flaw of many of the cases which have failed to afford § 1114 its plain meaning. Rather than beginning with the language of §§ 1114(a) or (e), and the language of the related provisions of §§ 1114(*l*) or § 1129(a)(13), the *Delphi* court began with its own assumptions of why § 1114 could not prohibit a debtor from doing in bankruptcy what it could do outside of bankruptcy. It then found statutory language, such as subsection (*l*), insufficiently persuasive to alter its view of what would be an appropriate result under Chapter 11. Statutory interpretation "should be made of sterner stuff" than that. The language Congress chose when crafting a statute must be considered first and foremost, and if plain and unambiguous, it must be credited, except in "rare and exceptional circumstances." *Rubin v. United States*,

449 U.S. 424, 430 (1981) (internal quotation marks omitted).

Appellees argue that this is such a rare and exceptional circumstance. "We do not look past the plain meaning unless it produces a result demonstrably at odds with the intentions of its drafters . . . or an outcome so bizarre that Congress could not have intended it." *Mitchell v. Horn*, 318 F.3d 523, 535 (3d Cir. 2003) (internal quotation marks and citations omitted). Appellees argue both legislative history and absurdity. We find neither a convincing reason to disregard the plain language of the statute.

## B. Legislative History

Appellees argue that the RBBPA's legislative history is inconsistent with our interpretation of § 1114. They rely on certain legislators' statements that § 1114 would prevent debtors from reneging on their "promises" or their "legal and contractual obligations." *See* Visteon's Br. 27 (listing examples of such

56

statements).  Seizing on these snippets of legislative history, Appellees contend that Congress did not intend § 1114 to apply in the absence of such promises or obligations.  The majority in *Chateaugay* focused on these same statements to buttress their conclusion that § 1114 did not apply following expiration of the CBA requiring payment.  *See Chateaugay*, 945 F.2d at 1210 ("As numerous legislators noted, the Act was created to 'insure that promises made to employees during their working years are not broken during their retirement years.'") (quoting 133 Cong. Rec. H1257 (daily ed. Mar. 11, 1987) (statement by Rep. Frost)).

"[O]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure" from the unambiguous plain language of a statute.  *United States v. Albertini*, 472 U.S. 675, 680 (1985) (alteration in original) (internal quotation marks omitted).  The statements cited by

57

Visteon fall woefully short of such an "extraordinary showing of contrary intentions." *Id.* It is uncontested that § 1114 applies to benefits that a debtor is legally or contractually obligated to provide. Therefore, it is not the least bit surprising that the legislative history reflects concerns about a debtor's legal and contractual obligations. This does not advance our inquiry very far. We must determine if § 1114 applies *only* to such benefits, despite plain language to the contrary. Neither Visteon nor the Unsecured Creditors are able to point to a single statement anywhere in the legislative history suggesting that the safeguards of § 1114 are triggered *only* in those instances where the debtor is legally or contractually obligated to provide benefits.[19]

---

[19] Furthermore, when Congress enacted the RBBPA, at least some legislators seemed to have a quite different understanding of what a legal or contractual obligation, or promise, to provide retiree benefits constituted than we do today. *See generally Retiree Health Benefits: The Fair-Weather Promise:*

In fact, the legislative history contains numerous references to a much broader congressional concern. No doubt because they were reacting to LTV's termination of benefits,

*Hearing Before the S. Spec. Comm. on Aging*, 99th Cong. 2d Sess. (1986) [hereinafter "*Fair-Weather Promise*"]. Then, the emergent judicial view was that retiree benefits were presumed to vest at retirement, unless the employer included in its SPD a clear indication of intent not to vest those benefits. *See id.* at 48. Legislators expressed concern about an employer's ability to avoid its "promises" and "obligations" through manipulation of contractual language. *See, e.g.*, *id.* at 2 (statement of Sen. Heinz) ("[E]mployers clever enough to place limits on their contract promises will have no obligation to pay."). In this context, we think the discussions of legal and contractual obligations and promises that Appellees point to may not have referred only to those benefits we would now call "vested," but likely also encapsulated certain legislators' opinions that an employer had an "obligation," once an employee retired, to continue payment of retiree benefits, notwithstanding contractual language to the contrary. *See, e.g.*, *id.* at 12 (statement of Sen. Wilson) ("Employers, we know, can easily place limits on the contracts; they can release themselves from an obligation to pay. Many have, or we would not be here today. . . . It is unfortunate that we need to be involved, and I think Congress has a responsibility to assist in providing some remedy for those threatened with such unremedied breach of contract."); *see also infra* Section IV.C. Furthermore, we note that terms such as "promise" and "obligation" need not refer only to promises and obligations enforced by law.

legislators discussed the "legitimate expectations" of retirees, and the necessity in a "just society" of giving effect to those expectations whenever possible. Representative Fish stated: "[t]hese retiree benefits, in my judgment, should receive special Bankruptcy Code protection because a just society has an interest in trying to *effectuate the legitimate expectations of former workers* – and vulnerable retirees may suffer enormously from benefit terminations." 134 Cong. Rec. H3486-02 (daily ed. May 23, 1988) (statement of Rep. Fish) (emphasis added). Similarly, Representative Feighan said:

> Under current law, retirees of bankrupt corporations often find their *legitimate expectations of long-term health and life insurance coverage* shattered – by the very company for whom they worked all their lives. Those who build a company deserve better. *They have earned the right to be treated fairly and compassionately*. . . . [This bill] would clarify the Bankruptcy Code to end the current unfairness.

*Id.* (statement of Rep. Feighan) (emphasis added).

60

Moreover, we do not believe that those legislators who spoke of "legitimate" expectations were referring only to vested benefits or benefits provided under an unexpired CBA. As Representative Edwards explained, Congress thought it "imperative that [it] protect the retirees from the sudden and unilateral termination of their health, life, and disability benefits . . . [because] [r]etirees who have devoted their working lives to the betterment of their employers' businesses *deserve payment of their retiree health benefits to the fullest extent possible in a reorganization.*"[20] *Id.* (statement of Rep. Edwards) (emphasis added).

---

[20] "Cherry-picking" favorable snippets of legislative history to establish the meaning of subsequently enacted legislation is an enterprise rife with the potential for mischief and abuse. We emphasize that we consider these statements not to find the meaning of § 1114 – its meaning is plain – but for the limited purpose of evaluating whether that plain language is "demonstrably at odds with the intentions of its drafters," *Mitchell*, 318 F.3d at 535 (internal quotation marks omitted), which it clearly is not.

We also think the statements of Senator Metzenbaum, the Senate sponsor of the RBBPA, merit serious attention. In discussing the scope of the legislation, he described a legislative intent directly at odds with the majority's construction of the statute in *Chateaugay*. Senator Metzenbaum explained that the bill "requires a company to continue paying for these [retiree] benefits *even after the termination of a collective bargaining agreement.* Only if a company can prove a modification is absolutely necessary and that it treats everyone fairly can a court, after a hearing, order any modification." *Retiree Benefits Security Act of 1987: Hearings on S. 548 Before the Subcomm. on Courts and Administrative Practice of the S. Comm. on the Judiciary*, 100th Cong., 1st Sess. 14 (1987) [hereinafter "*1987 Senate Hearings*"] (statement of Sen. Metzenbaum) (emphasis added). Senator Metzenbaum also explained the policy concerns underlying the legislation: "Bankruptcies are painful

62

for workers, communities, small business suppliers and others. *But the burden of turning a company around should not rest on the backs of retirees.* They deserve a fair shake from the companies they build and from the law governing the reorganization process." 134 Cong. Rec. S6823-02 (daily ed. May 26, 1988) (statement of Sen. Metzenbaum) (emphasis added). All of these remarks speak of a far broader legislative intent than Appellees would have us believe.[21]

---

[21] Appellees also draw our attention to those statements in the legislative history which refer to congressional concern with the "unilateral" termination of retiree benefits by a debtor. They argue that when a debtor terminates benefits pursuant to a reserved right in the plan, this is not a "unilateral" termination of benefits, as the retirees have in effect consented to their benefits being terminated by agreeing to work (and retire) under these terms. This argument originates from the district court's analysis in *Chateaugay*. That court reasoned that when a debtor terminates benefits based on the expiration of a CBA, it does not "unilaterally" terminate benefits. *LTV Steel Co. v. Connors* (*In re Chateaugay Corp.*), 111 B.R. 399, 404-05 (S.D.N.Y. 1990).

We do not disagree that Congress evidenced a concern about unilateral termination of benefits. However, we are not persuaded by the linguistic contortions necessary to equate a debtor's unilateral invocation of a reservation of rights clause with

Appellees' argument also ignores additional pieces of legislative history that specifically address the scope of § 1114. The Report drafted to accompany the Senate version of the bill, a more authoritative piece of legislative history than statements of individual legislators, explains:

> Section 1114 makes it clear that when a Chapter 11 petition is filed retiree benefit payments *must be continued without change until and unless* a modification is agreed to by the parties or ordered by the court. Section 1114(e)(1) *rejects any other basis* for trustees to cease or modify retiree benefit payments.

S. Rep. No. 100-119, 1988 U.S.C.C.A.N. at 687 (emphasis added). That Report, like the section it references, could hardly

---

a bilateral termination of benefits. As Professor Stabile explains, this line of reasoning confuses "unilateral termination of benefits" with "a unilateral change in the obligation to provide benefits." Stabile, *The Scope of Section 1114* at 1940-41. Even though a debtor invoking a termination clause does not unilaterally change its obligation to provide benefits, it most certainly unilaterally terminates benefits, and it was the latter of these two with which Congress was concerned.

be more clear.  Once a Chapter 11 petition is filed, there is only one way to terminate or modify retiree benefits while the debtor remains in Chapter 11, and that is through the procedure established in § 1114.  Again, the fact that the debtor could terminate those same benefits outside of bankruptcy is irrelevant.  *See also* 134 Cong. Rec. S6823-02 (daily ed. May 26, 1988) (statement of Sen. Heflin) ("Companies cannot unilaterally terminate benefits for retirees when the company files Chapter 11.  Rather, this bill makes it clear that when a Chapter 11 petition is filed, retiree benefit payments must be continued without change, until or unless a modification is agreed to by the parties or ordered by the court."); *Id.* (statement of Sen. Metzenbaum) ("[T]his measure makes absolutely clear that reorganizing companies may never unilaterally cut off retiree insurance benefits.").

Our analysis of legislative history would be incomplete

without further discussion of the underlying events that moved Congress to enact the RBBPA. *See Elliot Coal Mining Co. v. Office of Workers' Comp. Programs,* 17 F.3d 616, 631 (3d Cir. 1994) (A court should "look to the 'mischief and defect' that the statute was intended to cure.") (quoting *Heydon's Case*, 76 Eng. Rep. 637 (Ex. 1584)).

Here, there is no question that Congress enacted the RBBPA to respond to the harm (and outrage) following LTV Corporation's termination of the benefits of 78,000 retirees without notice during its 1986 bankruptcy. As one legislator explained:

> [t]he vulnerability of retiree benefits was exposed when LTV unilaterally terminated the health and life insurance benefits of tens of thousands of retirees across the country. Public outrage followed causing LTV to restore the benefits, but the ensuing fear and mistrust made it obvious that a legislative response was necessary. Congress needed to ensure workers that a unilateral termination would never occur again.

134 Cong. Rec. E1672-02 (daily ed. May 24, 1988) (statement by Rep. Oakar).

In attempting to craft an appropriate legislative response to LTV's bankruptcy, Congress heard testimony about the effect of LTV's bankruptcy on its retirees, *see generally LTV Bankruptcy: Hearing before the S. Comm. on the Judiciary*, 99th Cong., 2d Sess. (1986) [hereinafter "*LTV Bankruptcy*"], as well as about the broader causes of retiree benefit insecurity, *see generally Fair-Weather Promise*. Congress was aware that among the retirees affected by LTV's actions "were persons who received their insurance benefits pursuant to collective bargaining agreements, and those who received those benefits pursuant to non-collectively bargained plans." S. Rep. No. 100-119, 1988 U.S.C.C.A.N. at 683. Congress accordingly was fully committed to ensuring that both union and non-union employees would be equally protected by the RBBPA. *See, e.g.*, 134 Cong.

Rec. 12,698 (statement of Sen. Metzenbaum) ("The provisions of [the RBBPA] apply to union and nonunion retirees."); *LTV Bankruptcy* at 52 (statement of Sen. Metzenbaum) ("[W]e will make every effort at the legislative level to protect the rights of the salaried employees just as we will make an effort to protect the rights of the employees who have the collective bargaining agreement."). Importantly, Congress also heard testimony that since retiree benefits were increasingly "unvested," *see Fair-Weather Promise* at 24, 43, 78, soon the only benefits employers would not be able to unilaterally terminate outside of bankruptcy were those covered by a current contractual agreement, such as a CBA, *id.* at 53-54. Congress was therefore aware that debtors would almost always have an extra-bankruptcy right to unilaterally terminate the benefits of non-union employees.

If we were to credit Appellees' interpretation of § 1114 and remove from its protections those benefits that could be

unilaterally terminated outside of bankruptcy, the provision would almost never protect non-union employees. As Congress knew, "[a]ny debtor – most debtors, more than likely – would be able to point to language . . . giving them the right to unilaterally terminate the programs." *In re Farmland Indus., Inc.*, 294 B.R. at 917. Appellees' reading therefore "eviscerate[s]" the statute, making it "essentially only apply to collective bargaining agreements or other bargained-for programs, and the legislative history makes it clear that such limitations were not intended." *Id.*

Appellees also cite to *subsequent* legislative history in support of their argument that § 1114 does not apply to benefits that could be unilaterally terminated outside of bankruptcy. In 2007, bills were introduced in both houses of Congress which would have added a clause stating that § 1114's protections apply "whether or not the debtor asserts a right to unilaterally

modify such payments under such plan, fund, or program."
H.R. 3652, 110th Cong. § 9 (2007); *see also* S. 2092, 110th
Cong. § 9 (2007). Neither bill was enacted into law. Appellees
insist that Congress' consideration and rejection of these
amendments indicates both that § 1114 does not apply to
benefits that are terminable at will, and that Congress concluded
that extending protection to such benefits was unwise.

We are unpersuaded. Evidence of congressional inaction
is generally entitled to minimal weight in the interpretive
process. This is especially true where Congress enacts a statute
as clear as this one. In *Pension Benefit Guaranty Corp. v. LTV
Corp.*, 496 U.S. 633 (1990), a case which also arose in the wake
of LTV's bankruptcy, the Supreme Court addressed whether the
Pension Benefit Guaranty Corporation ("PBGC") could base a
decision to order an employer to restore a pension plan on the
employer's creation of "follow-on" plans, which the PBGC

70

believed improperly exploited the agency.  LTV relied in part

upon the fact that Congress had considered, but not enacted, an

amendment that would have expressly authorized the PBGC to

prohibit follow-on plans.   Because Congress rejected the

amendment, LTV argued that the Court should infer that

Congress did not want the agency to have this authority.  The

Court was not convinced.  It explained that:

> subsequent legislative history is a hazardous basis
> for inferring the intent of an earlier Congress. . .
> . It is a particularly dangerous ground on which to
> rest an interpretation of a prior statute when it
> concerns, as it does here, a proposal that does not
> become law. . . . Congressional inaction lacks
> persuasive significance because several equally
> tenable inferences may be drawn from such
> inaction including the inference that *the existing
> legislation already incorporated the offered
> change*.

*Id.* at 650 (internal quotation marks and citations omitted)

(emphasis added).

Here, too, we think the best inference to be drawn from

71

the subsequent legislative history relied on by Appellees is that Congress chose not to act because the "existing legislation already incorporated the offered change." *Id.*

## C. Absurdity

As we have discussed, a court must give effect to a statute's unambiguous plain language "unless it produces a result demonstrably at odds with the intentions of its drafters . . . or an outcome so bizarre that Congress could not have intended it." *Mitchell*, 318 F.3d at 535 (internal quotation marks and citations omitted); *see also Holy Trinity Church v. United States*, 143 U.S. 457 (1892) ("If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity. The court must restrain the words.") (internal quotation marks and citations omitted). Having concluded that § 1114 is unambiguous and certainly not demonstrably at odds with indications of congressional intent in

72

the statute's legislative history, we are left with Appellees' final argument: that interpreting § 1114 to give retirees more rights under Chapter 11 than they would have outside of bankruptcy is so absurd, notwithstanding the plain language of the statute and all the indications of congressional intent discussed above, that Congress simply could not have intended the result. This argument reflects a major source of confusion about § 1114, and we believe it is the primary reason that courts have failed to give effect to the statute as written. Accordingly, although we find the argument meritless, we address it with particular care.

Appellees begin by emphasizing that our reading of § 1114 is contrary to the fundamental bankruptcy principle that "prepetition contract rights and property interests should not be analyzed differently or enhanced simply because an interested party is involved in a bankruptcy case." Visteon's Br. 33 (quoting *In re Delphi Corp.*, 2009 WL 637315, at *2).

73

However, as the Supreme Court explained in *Butner v. United States*, "[t]he constitutional authority of Congress to establish 'uniform Laws on the subject of Bankruptcies throughout the United States' would clearly encompass a federal statute" modifying underlying property rights for the purposes of bankruptcy. 440 U.S. 48, 54 (1979) (quoting U.S. Const., Art. I, § 8, cl. 4). Thus, although property interests are usually defined by non-bankruptcy law, a "federal interest [may] require[] a different result." *Id.* at 55.

Section 1114 unambiguously states that federal bankruptcy law compels a "different result" here, yet courts have refused to allow that result. For example, the bankruptcy court reasoned, § 1114 "cannot modify existing [non-bankruptcy] law absen[t] some specific bankruptcy reason and there is none here in connection with the issue of non-vested retiree benefits." J.A. 3574. Consistent with that court's

74

conclusion, Appellees argue that it would be absurd to impose restrictions on the modification of benefits in bankruptcy that ERISA ensures will not be imposed outside of bankruptcy. As a threshold matter, we point out that this argument sets far too low a bar for "absurdity." *See Terlingo*, 327 F.3d at 221 (Courts may look behind a statute only when the plain meaning produces "a result that is not just unwise but is clearly absurd.") (internal quotation marks omitted). Furthermore, as we will now explain, it is also based on a fundamental misunderstanding of the context in which the RBBPA was enacted, as well as the practical realities surrounding an employer's provision of benefits to its retirees.

We begin with a brief discussion of how retiree benefits are treated under ERISA. ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90

(1983), and to "protect contractually defined benefits," *Mass. Mut. Life Ins. v. Russell*, 473 U.S. 134, 148 (1985). Although ERISA contains elaborate vesting requirements for pension plans, it does not mandate vesting of welfare benefit plans, such as those providing retiree health and life insurance benefits. *See In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*, 58 F.3d 896, 901 (3d Cir. 1995) ("*Unisys II*"). "This was not merely an oversight on the part of Congress." *UAW v. Skinner Engine Co.*, 188 F.3d 130, 138 (3d Cir. 1999). Congress did not impose vesting requirements on welfare benefit plans because:

> it determined that [t]o require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income. . . . In rejecting the automatic vesting of welfare plans, Congress evidenced its recognition of the need for flexibility with regard to an employer's right to change medical plans.

*Unisys II*, 58 F.3d at 901 (alteration in original) (internal

quotation marks and citations omitted).  Congress believed that imposing strict requirements on these benefits and thereby denying employers their valued flexibility would result in employers choosing not to provide the benefits at all.  Employers are for this reason "generally free . . . for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

In light of the policy concerns underlying ERISA, Appellees argue that it is nonsensical to protect during bankruptcy what Congress purposefully refused to protect otherwise.  That argument, however, is premised on the false assumption that the Congress that enacted the RBBPA was content with the fallout from the policy decisions embedded in ERISA.  The legislative history of the RBBPA[22] establishes the

---

[22] Again, we consider this history not to find the meaning of § 1114, as its meaning is clear, but as a response to Appellees' argument that the statute's plain language is absurd and must be

contrary – that many of its drafters were deeply troubled by the social problems that had resulted from the exclusion of retiree welfare benefits from ERISA's protections.

As we have noted, LTV's termination of retiree benefits prompted Congress to study not only the treatment of retiree benefits during bankruptcy, but for the first time after enacting ERISA, to evaluate the sufficiency of retiree benefit protections more broadly. *See generally Fair-Weather Promise*. The consensus of many who testified before Congress was that retiree health benefits were unacceptably vulnerable because retirees, unlike working employees, were often entirely dependent on these benefits, and yet the law failed to ensure that they vested at retirement. Although federal common law under ERISA was then more protective of retiree benefits than it is now, the emerging judicial view at that time was that retiree

rejected.

benefits would vest at retirement, *unless* the employer clearly indicated a contrary intent.[23] *See, e.g.*, *id.* at 46-59. Employers, armed with this knowledge, were including reservation of rights clauses in virtually all new plans. *See, e.g.*, *id.* at 43 (testimony of Willis B. Goldbeck, Washington Business Group on Health) ("[N]o new plans are being written without very explicit authority to alter or terminate."). Accordingly, most retiree benefits, at least for non-union retirees, would soon be entirely without protection, susceptible to termination not only during a bankruptcy, but whenever an employer "simply amends the plan."[24] *Id.* at 94.

---

[23] We have held that retiree benefits do not vest, even upon retirement, unless the employer has clearly and unambiguously indicated its intent for them to do so *See, e.g.*, *Skinner*, 188 F.3d at 141.

[24] At minimum, with this extensive legislative history in mind, we think it virtually impossible that Congress, if it had intended to exclude unilaterally terminable benefits from § 1114's protection, would not have addressed the issue directly. Given its

79

Some legislators thus concluded that the problem that must be remedied was not just bankruptcy law,[25] but ERISA itself. *See, e.g*, *id.* at 16 (statement of Sen. Dodd) ("With the enactment of ERISA in 1974, the Government for the first time . . . rightly assumed a role in guaranteeing pension rights in the private sector. It may be time to consider extending similar protections to earned health benefits."). Although some

acute awareness that many retiree benefits were unprotected outside of bankruptcy, its decision to draft legislation protecting *any* retiree benefit payments takes on an even greater salience.

[25] Notably, Congress heard testimony emphasizing that bankruptcy law was neither the primary cause, nor the ideal solution, for the retiree health care problem. Professor Baird from University of Chicago School of Law explained: "[t]he basic rule of bankruptcy law is that it takes rights as they exist outside of bankruptcy. Retiree health benefits fare poorly in bankruptcy because of the status of these rights outside bankruptcy. . . . [T]he solution is not to change the bankruptcy laws, but rather to change the rights of these retirees under nonbankruptcy law." *Fair-Weather Promise* at 62. He added: "I would caution against trying to solve the problem by creating a special status for retiree health benefits in bankruptcy. . . . [If you do so,] you are only curing half the problem." *Id*.

continued to be wary about extending the full panoply of ERISA protections to retiree benefits, *see, e.g.*, *id.* at 2 (statement of Sen. Heinz) ("[T]he simple solution would be for the Congress to step in, as we did 12 years ago with pensions, and make these benefits permanent at retirement, but we also need to recognize the chilling effect this would have on the employer's willingness even to offer these benefits."), there was still significant support for extending at least some ERISA protections to the retiree welfare benefit context, s*ee, e.g.*, *id.* at 18 (statement of Sen. Glenn) (expressing support for minimum funding requirements for retiree health insurance plans); *see also id.* at 95 (staff report recommending additional protections for all retiree benefits, including funding and notification requirements, and "explor[ation of] a permanent means for protecting unfunded retiree health benefits in full.").

Ultimately, the RBBPA addressed retiree benefits only

81

during bankruptcy.  Nonetheless, the Senate Report indicates that congressional concern continued to extend further.  The Report discusses generally the "hardship imposed on elderly recipients when such benefits are suddenly curtailed."  S. Rep. No. 100-119, 1988 U.S.C.C.A.N. at 684.  However, it explains, "this bill addresses the needs of retirees within [the] context of the traditional structure of the Bankruptcy Code.  The broader issues associated with retiree benefits remain to be addressed by other committees of appropriate jurisdiction."  *Id.*

To the extent that some courts have been unable to understand why Congress would protect certain retiree benefits during bankruptcy, but not otherwise, the short answer may be that the RBBPA, like many legislative enactments, was an imperfect compromise.  Whether the statute was the best protection that could be agreed upon, or whether it was intended only as a first step, the RBBPA is the middle-ground that

became law.  That it is a partial solution to congressional concerns in no way converts it into an absurdity.  Virtually all laws would be absurd if judged by whether they accomplish a perfect solution to an underlying legislative concern.

Moreover, since many members of Congress were deeply upset at the prospect of employers terminating benefits during retirement, but were either unable or unwilling to require vesting, there is a compelling logic to protecting these benefits solely during bankruptcy – when benefits are highly vulnerable, and limited protections can have a significant impact.

As the union explained at oral argument, employers do not offer retiree benefits solely to be charitable.  Under normal conditions, retiree benefits benefit the employer as well as the retiree.  Retiree benefits are often a form of deferred

compensation.[26] Through their provision, an employer is able to secure work now, and pay for it only fully in the future. Furthermore, these benefits boost morale and help an employer retain qualified employees. Contrary, during "good times," market forces do much to restrain an employer from exercising any retained right to terminate benefits.

The same is not true during "bad times." It is then that retiree benefits are most at risk. Of course, one of the purposes underlying ERISA is to allow employers flexibility to terminate benefits when they feel it prudent to do so, as they presumably might during an economic downturn. A Chapter 11 reorganization is unique, however, because a reorganizing

---

[26] The record certainly shows this to be true here. The union has proffered substantial evidence that workers at both the Connersville and Bedford plants agreed to forego wage increases in exchange for retiree health benefits. According to union calculations, in order to secure these benefits, each Connersville retiree deferred $23,973.60 of her/his compensation, and each Bedford retiree deferred $60,908.00. J.A. 1646-54.

company avails itself of the statutory privilege of bankruptcy in order to transition to greater viability. A reorganizing company hopes to emerge and be profitable, at which point the provision of retiree benefits might again inure to its benefit. During the reorganization process itself, though, the debtor faces intense pressure both internally and externally to relieve itself of all perceived liabilities, even those it might otherwise be inclined to keep. *See LTV Bankruptcy* at 14 (testimony of Richard Trumka, National President of The United Mineworkers of America) ("LTV says it is under enormous pressure from its creditors, banks, and vendors."); *1987 Senate Hearings* at 16 (statement of Sen. Heinz) (Making matters worse in bankruptcy is that "the banks and in some cases the active workers may agree" that retiree benefits are "some kind of an albatross."[27]).

---

[27] For example, the Unsecured Creditors insist that the retiree benefits here "do not accrete *any* value to Visteon." Unsecured Creditors' Br. 18 (emphasis added).

Thus, as Professor Stabile thoughtfully explains, bankruptcy distorts the normal decision-making process:

> Outside of bankruptcy, employers evaluate changes in employee benefit plans in terms of their impact on overall human resource objectives as well as financial objectives; decisions about a particular benefit are made within the broad context of an employer's total compensation and benefits package. That overall framework is missing in a Chapter 11 case, where a debtor faces pressures that distort nonbankruptcy planning and decisions. In Chapter 11, the debtor effectively does not act as a sole decision-maker. A strong creditors' committee or even a particularly large individual creditor plays a large role in the debtor's decision-making. Within the confines of a bankruptcy proceeding, there is thus a desire to temporarily freeze the status quo regarding benefits, and to allow modification of those benefits only in a supervised manner that attempts to resolve the competing interests of retirees, debtors, and creditors.

Stabile, *The Scope of Section 1114* at 1953-54.

Against this backdrop, § 1114 can be seen as affording additional protection to retiree benefits just as legal and

86

economic pressures converge to encourage a debtor to terminate benefits based on short-term considerations with insufficient regard for long-term consequences to retirees or to the debtor itself. Protecting these benefits during a Chapter 11 reorganization is thus a measured middle-ground.

Moreover, courts that have concluded it is absurd to apply § 1114 to benefits that could be terminated outside of bankruptcy have often misinterpreted the rigidity of the section's protections, and therefore the extent to which the statute is in tension with ERISA. Section 1114 does *not* prohibit the termination of benefits during a bankruptcy proceeding. Rather, it creates an equitable procedure through which the debtor can argue the economic necessity of doing so, and the retirees can counter with their own arguments about economics, fairness, and equity. The specter of this process may, by itself, foster an agreement about continuing or modifying retiree

87

benefits that would otherwise be impossible to reach. However, if no agreement is reached, a court can, and in fact must, order modification (or termination) of benefits if doing so is necessary to the reorganization, fair to all affected, and clearly favored by the equities. This is a high standard to reach, but that is consistent with the belief that reorganization should not take place, if at all possible, "on the backs" of retired workers. 134 Cong. Rec. S6823-02 (daily ed. May 26, 1988) (statement of Sen. Metzenbaum). Importantly, though, in its weighing of the equities, a court will undoubtedly consider whether the debtor has reserved the right to unilaterally terminate benefits. It would not be the beginning and the end of the court's inquiry, and the court would have to decide how much weight to give that factor in light of all the other equities. Still, a debtor's legal rights under ERISA are not irrelevant during the § 1114 process.

Additionally, it must be remembered that § 1114's

protections terminate upon plan confirmation, when the distorting pressures discussed above recede. Thus, contrary to the court's conclusion in *In re N. Am. Royalties, Inc.*, 276 B.R. at 867 (construing § 1129(a)(13) as "vest[ing] . . . benefits after reorganization"), § 1129(a)(13) does not vest benefits. As we have explained, upon emergence from bankruptcy, § 1129(a)(13) ensures that a debtor who reserved the right to terminate retiree benefits has no ongoing obligation, other than one that may have been voluntarily undertaken during the § 1114 process, to continue to provide benefits.

Therefore, § 1114 is neither entirely nor permanently in derogation of underlying contractual rights. For the most part, all § 1114 guarantees retirees is a voice, and some minimal amount of leverage, in a process that could otherwise be nothing short of devastating to them and to their families and

89

communities.[28]  As one legislator explained: "[t]his legislation will not guarantee continuation of these benefits, but it will provide a mechanism that will allow the retirees' position to be heard."  133 Cong. Rec. 3,732 (1987); *see also* 134 Cong. Rec. S6823-02 (daily ed. May 26, 1988) (statement of Sen. Heinz) ("While chapter 11 reorganization . . . work[ed] to protect the

---

[28] We emphasize that Congress enacted the RBBPA because it considered the termination of retiree benefits a true human tragedy.  Some legislators reacted to LTV's termination of retiree health and life insurance benefits with horror, characterizing it as "one of the most indefensible and unconscionable acts of any American corporation in this century." *LTV Bankruptcy* at 28 (statement of Rep. Feighan).  Although Visteon has proceeded with far greater care than LTV, the record shows that the consequences of its termination of benefits have nonetheless been catastrophic.  Visteon's unilateral decision to terminate benefits has left some retirees without medical care entirely, and forced those too critically ill to do without medical care to sacrifice basic necessities in order to pay for COBRA coverage.  *See* J.A. 3624-87.  This is to say nothing of the stress and anxiety that all Visteon retirees have suffered, *see id.*, and the collective impact of each of these individual tragedies on the broader Connersville and Bedford communities, *see* J.A. 1718, 3779.  Congress hoped to ameliorate exactly this sort of human suffering by enacting the RBBPA.

interests of the major, and usually secured, creditors, it left the retirees totally exposed to catastrophic medical losses while bankruptcy lawyers bickered over the reorganization plan. The retirees had no way to make their concerns known to the court during bankruptcy"). We therefore reject Visteon's characterization of § 1114 as a "hammer." It is much more accurately characterized as a "microphone," intended to elevate the voices of those who would otherwise not be heard above the din of more powerful creditors carving up the pie of the bankruptcy estate.

Appellees attempt to argue that our interpretation of § 1114 results in the statute being the *only* provision of the bankruptcy code that improves upon a creditor's rights in bankruptcy; the union does not counter that assertion.[29]

---

[29] Of course, as amended, § 1114 contains not one, but two, distinct provisions improving upon creditors' prepetition contract rights, § 1114(e) and § 1114(*l*).

Assuming, *arguendo*, that the statutory scheme of § 1114 is unique, this result is certainly not absurd given Congress' concerns. The RBBPA's legislative history is replete with references to the unique nature of retiree benefits in a bankruptcy proceeding, and it is therefore not surprising that Congress would afford them unique protections. As the Senate Report noted: "[t]he special treatment accorded retiree benefit payments is appropriate because of the hardship imposed on elderly recipients when such benefits are suddenly curtailed." S. Rep. No. 100-119, 1988 U.S.C.C.A.N. at 684. Senator Heinz reasoned that "special" protection was necessary to ensure equality of treatment: "[Retirees] don't start out on a[n] equal footing with other creditors. . . . [This bill protects] retirees from the kinds of risks no other creditors face." *1987 Hearings* at 20 (statement of Sen. Heinz). The court in *In re Farmland Indus., Inc.* thus found it unremarkable that retirees were uniquely

92

protected in bankruptcy:

> Congress doubtlessly recognized that retirees as a class are unique in a bankruptcy proceeding and that they are deserving of special protection. . . . As a general rule, retirees are particularly vulnerable when their former employer goes bankrupt, because of their ages, their reduced incomes, and their inability to replace the benefits . . . that are being terminated. Unlike business and trade creditors, retirees are unable to set aside reserves for possible losses or to pass along their losses to other customers. . . . All of these suggest a sound basis and rationale for Congress' according special protections to retirees who are caught up in a Chapter 11 proceeding.

294 B.R. at 918-19.

For all of these reasons, we conclude that the rule of statutory construction allowing a court to ignore the plain language of a statute when literal interpretation results in absurdity is entirely inapplicable here. Far from being "absurd," a literal interpretation of § 1114 reveals a remedial and equitable statutory scheme that, consistent with Congress' concerns when

93

enacting the RBBPA, attempts to prevent the human dimension of terminating retiree benefits from being obscured by the business of bankruptcy. If the limited role of federal courts in a democratic society is to mean anything, the doctrine of "absurdity" must not be employed merely because interpreting a statute as enacted yields a result that is contrary to a judge's personal beliefs about how things should be.

The text of § 1114 is plain in meaning and breadth. Its wisdom is not for us to decide. We need not, and should not, be concerned with whether retiree benefits should be extended greater protection during bankruptcy than otherwise; that is a job for Congress. We need only give effect to the law Congress has enacted.

## V. Conclusion

For the reasons set forth above, we will reverse the district court's order that affirmed the bankruptcy court's order

94

permitting Visteon to terminate provision of retiree health and

life insurance benefits without complying with § 1114.